UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALBERT AND EVELYN BRODZINSKY, <br><br> Plaintiffs, <br><br> v. <br><br> FRONTPOINT PARTNERS LLC, YVES BENHAMOU, JOSEPH F. "CHIP" SKOWRON, JOHN DOE INVESTMENT ADVISORS I – VI AND JOHN DOE HEDGE FUNDS I – VI, <br><br> Defendants. | DOCKET NO. _____ <br><br><br><br> JANUARY 4, 2011 |

## CLASS ACTION COMPLAINT

Plaintiffs Albert and Evelyn Brodzinksy ("Plaintiffs"), based on the investigation of their counsel, which included the review of public filings of the United States Department of Justice and the United States Securities and Exchange Commission, allege on information and belief as follows:

### INTRODUCTION

1.     Over a six-week period in December 2007 and January 2008, six healthcare-related hedge funds managed by Defendant FrontPoint Partners LLC ("FrontPoint") sold more than six million shares of Human Genome Sciences, Inc. ("HGSI") common stock while their

portfolio manager, Defendant Joseph F. "Chip" Skowron ("Skowron") possessed material negative non-public information concerning HGSI's clinical trial for the drug Albumin Interferon Alfa 2-a ("Albuferon").

2.      Skowron's information came from Defendant Yves Benhamou, M.D. ("Benhamou"), one of five members of a Steering Committee overseeing the Albuferon trial, who, at the same time, provided consulting services to Skowron – and the investment advisors and hedge funds with which the portfolio manager was affiliated – on multiple occasions since at least 2006. Indeed, a hedge fund sponsor affiliated with Skowron paid substantial fees to the company for which Benhamou worked as a consultant so that Skowron and others could consult with experts in the healthcare sector.  Benhamou and Skowron also developed a friendship over the years and, in fact, many of Benhamou's consults with the portfolio manager were informal.

3.      Commencing in November 2007, and on multiple occasions prior to January 23, 2008, Benhamou learned material non-public information about the Albuferon trial that had negative implications for Albuferon's future commercial potential.  He communicated such information to Skowron in violation of his duty to HGSI to keep the information confidential. Skowron knew or absent deliberate recklessness should have known that Benhamou served on the trial's Steering Committee and owed a duty of confidentiality to HGSI, but, nonetheless, he immediately took action to sell the FrontPoint hedge funds' holdings of HGSI common stock. On key dates prior to HGSI's announcement of negative news concerning the trial, including minutes before the close of the markets on January 22, 2008, Skowron, acting under the authority delegated to him by FrontPoint, caused the investment advisors for the six FrontPoint hedge funds to cause those hedge funds to sell all of their remaining holdings of HGSI common stock.

4.     On January 23, 2008, HGSI publicly announced that all patients who had been administered a higher dosage level of Albuferon in its clinical trial would be moved to a lower dosage level due to a safety issue detected during Phase 3 of the trial. The higher dosage level was believed, until then, to have greater commercial potential than the lower dosage. In response to HGSI's announcement, the market price of HGSI's common stock fell by approximately 44 percent, to $5.62 a share by the close of the markets that day.

5.     Overall, the six FrontPoint hedge funds sold more than 6 million shares of HGSI common stock – representing all of their holdings – thereby avoiding at least $30 million in losses. After HGSI made its January 23, 2008 public announcement regarding Albuferon as the price of HGSI stock declined, the hedge funds went back into the market and re-purchased shares of HGSI common stock, at reduced prices.

6.     By this conduct, all of the Defendants violated the antifraud provisions of the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240]. All of the Defendants are also liable under Section 20A of the Exchange Act, 15 U.S.C. [15 U.S.C. § 78t-1], due to their unlawful insider trading actions. In addition, FrontPoint and the investment advisors for the hedge funds, and Skowron are liable under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] as "controlling persons" of the hedge fund defendants.

## JURISDICTION AND VENUE

7.     The claims alleged herein arise under Sections 10(b), 10b-5, 20(a) and 20A of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1, 17 C.F.R. § 240. Jurisdiction and venue are proper pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa.  Certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

**THE PARTIES**

**PLAINTIFFS**

8.     **Albert and Evelyn Brodzinsky** are individuals residing in Maryland.  As detailed in the attached Schedule A, Plaintiffs bought 1,000 shares of HGSI at $11.3299 on January 3, 2008, contemporaneous with the FrontPoint defendants' sales of HGSI common stock while in possession of material, adverse non-public information.  Plaintiffs also paid a commission of $9.99 for a total transaction cost of $11,339.89.

**DEFENDANTS**

9.     **Yves Benhamou, M.D. ("Benhamou"),** age 49, is a citizen and resident of France, and a medical doctor specializing in hepatitis and other diseases of the liver.  Throughout the period covered by this Complaint, Benhamou was the Chief of Department, Clinical Research in Hepatology, Hôpitaux de Paris-Pitié-Salpétrière and an Associate Professor of Hepatology at the Hôpitaux de Paris-Pitié-Salpétrière in Paris, France.  He was also a clinical investigative physician for HGSI and was involved with the clinical trial for Albuferon in two capacities:  (i) he served on the Steering Committee that oversaw the trial and (ii) he was a "country lead investigator" for France and other parts of Europe.  By virtue of his role in the clinical trial, and in accordance with the terms of his contract with HGSI, Benhamou owed HGSI a duty to hold in strict confidence all information learned in connection with his participation in the HGSI clinical trial and to use such information only for the benefit of HGSI.  While serving on the Steering Committee, Benhamou also had a consulting relationship with, amongst others,

4

defendant FrontPoint hedge funds and other investors that purchased and sold healthcare-related securities.

10.     **FrontPoint Partners LLC ("Frontpoint")** is a Delaware limited liability company with offices in New York and Connecticut.  FrontPoint is a subsidiary of the investment bank Morgan Stanley, and is directly, or through its investment advisor subsidiaries, the investment advisor to the six FrontPoint healthcare-related hedge funds.

11.     **Joseph F. "Chip" Skowron ("Skowron")** was, throughout the period covered by this Complaint, a Managing Director of Morgan Stanley, an executive officer of the six investment advisors affiliated with FrontPoint, and a co-portfolio manager of the six FrontPoint healthcare-related hedge funds.  FrontPoint hired Skowron, a doctor by training, in 2003 to manage investments in healthcare stocks.  Skowron worked in the Connecticut and New York offices of Morgan Stanley and FrontPoint.  Skowron's compensation for 2007 and 2008 was linked to the performance of the hedge funds that he managed for FrontPoint and the fees earned by the funds' investment advisor/management company.

12.     **FrontPoint Hedge Fund 1** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  Skowron was, at all times covered by this Complaint, a co-portfolio manager of this fund.  In his capacity as an executive officer of the fund's general partner, Skowron had discretionary authority to select trades and determine the allocation of the fund's investments.  As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

13.     **FrontPoint Hedge Fund 2** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare

and healthcare-related companies predominantly in the United States. It seeks to have a longer investment horizon than FrontPoint Hedge Fund 1. Skowron was, at all times covered by this Complaint, a co-portfolio manager of FrontPoint Hedge Fund 2. In his capacity as an executive officer of the fund's general partner, Skowron had discretionary authority to select trades and determine the allocation of the fund's investments. Skowron was also a limited partner of and personally invested in this fund. As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

14.     **FrontPoint Hedge Fund 3** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States. It has a similar horizon and strategy to FrontPoint Hedge Fund 1 except it contains assets subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). Skowron was, at all times covered by this Complaint, a co-portfolio manager of FrontPoint Hedge Fund 3. In his capacity as an executive officer of the fund's general partner, Skowron had discretionary authority to select trades and determine the allocation of the fund's investments. As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

15.     **FrontPoint Hedge Fund 4** is a Cayman Islands exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States. It seeks to replicate the portfolio of FrontPoint Hedge Fund 1 but employs substantially more leverage to target a gross exposure and net exposure that is two times that of FrontPoint Hedge Fund 1 at the beginning of each month. Skowron was, at all times relevant to this Complaint, a co-portfolio manager of this fund. In his capacity as an executive officer of the fund's general partner,

6

Skowron had discretionary authority to select trades and determine the allocation of the fund's investments. Skowron was also personally invested in this fund through its onshore feeder fund, of which he is a limited partner. As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

16.     **FrontPoint Hedge Fund 5** is a Cayman Islands exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States. It seeks to employ the same investment process and approach as FrontPoint Hedge Fund 2 but to have a longer investment horizon and greater variability in its net exposure to the market over time. Skowron was, at all times relevant to this Complaint, a co-portfolio manager of this fund. In his capacity as an executive officer of the fund's general partner, Skowron had discretionary authority to select trades and determine the allocation of the fund's investments. Skowron was also personally invested in this fund through its onshore feeder fund, of which he is a limited partner. As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

17.     **FrontPoint Hedge Fund 6** is a Cayman Islands exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States. Skowron was, at all times relevant to this Complaint, a co-portfolio manager of this fund. In his capacity as an executive officer of the fund's general partner, Skowron had discretionary authority to select trades and determine the allocation of the fund's investments. As described in paragraph 19 below, the Plaintiffs do not currently know the precise identity of this defendant.

18.     **FrontPoint Hedge Funds 1 through 6** are hereinafter referred to, in the collective, as the **"Hedge Fund Defendants."**

19.     Upon information and belief, the identities of the Hedge Fund Defendants are as follows.  The Defendants FrontPoint Hedge Fund 1, 2 and 3 are three among the following five FrontPoint hedge funds that are Delaware Limited Partnerships:  FrontPoint Healthcare I Fund LP, FrontPoint Healthcare Flagship Fund LP, FrontPoint Onshore Healthcare Flagship Enhanced Fund LP, FrontPoint Healthcare Horizons Fund LP, and FrontPoint Healthcare Emerging Markets Fund LP.  The Defendants FrontPoint Hedge Fund 4, 5 and 6 are three among the following five FrontPoint hedge funds that are Cayman Islands exempted limited partnerships:  FrontPoint Offshore Healthcare I Fund LP, FrontPoint Offshore Healthcare Horizons Fund LP, FrontPoint Offshore Healthcare Flagship Fund LP, FrontPoint Healthcare Flagship Enhanced Fund LP, and FrontPoint Offshore Healthcare Flagship Enhanced Fund LP.  Plaintiffs seek expedited discovery from FrontPoint in order to determine the precise identities of the Hedge Fund Defendants.

20.     **Investment Advisor 1,** a Delaware limited liability company affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 1.  Skowron was an executive officer of Investment Advisor 1.  As described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

21.     **Investment Advisor 2,** a Delaware limited liability company affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 2.  Skowron was an executive officer of Investment Advisor 2.  As

described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

22. **Investment Advisor 3,** an investment advisor registered under the U.S. Investment Advisors Act of 1940, affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 3. Skowron was an executive officer of Investment Advisor 3. As described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

23. **Investment Advisor 4,** a Delaware limited liability company affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 4. Skowron was an executive officer of Investment Advisor 4. As described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

24. **Investment Advisor 5,** an investment advisor registered under the U.S. Investment Advisors Act of 1940, affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 5. Skowron was an executive officer of Investment Advisor 5. As described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

25. **Investment Advisor 6,** a Delaware limited liability company affiliated with FrontPoint, was the General Partner of and provided investment advice and management services to FrontPoint Hedge Fund 6. Skowron was an executive officer of Investment Advisor 6. As described in paragraph 26 below, Plaintiff does not currently know the specific identity of this defendant.

26.     **Investment Advisors 1 through 6** are hereinafter referred to, in the collective, as the **"Investment Advisor Defendants."**   The specific identities of the Investment Advisor Defendants are not currently known by Plaintiffs.   Plaintiffs seek expedited discovery from FrontPoint in order to determine the precise identities of the Investment Advisor Defendants.

**OTHER RELEVANT PERSONS AND ENTITIES**

27.     **Human Genome Sciences, Inc. ("HGSI")** is a biopharmaceutical company that is incorporated in Delaware and headquartered in Rockville, Maryland.   HGSI's common stock is registered with the Commission pursuant to Exchange Act Section 12(b) and quoted on the NASDAQ Global Market under the ticker symbol HGSI.   HGSI is not a defendant in this action and Plaintiffs make no allegation herein of any wrongdoing by HGSI.

28.     **Co-Portfolio Managers 2, 3 and 4** are, and throughout the period covered by this Complaint were, Managing Directors of Morgan Stanley.   Co-Portfolio Managers 2 and 3 with Skowron, were executive officers of the Investment Advisor Defendants and co-portfolio managers of the Hedge Fund Defendants.   Co-Portfolio Manager 4 worked principally out of FrontPoint's Connecticut offices and, with Skowron and Co-Portfolio Managers 2 and 3, was an executive officer of two of the Investment Advisor Defendants and a co-portfolio manager of two of the Hedge Fund Defendants.

29.     **Healthcare Trader 1** is a trader for FrontPoint who, during the relevant time period, accepted trade orders from Skowron and Co-Portfolio Managers 2, 3 and 4, and submitted trades for the Hedge Fund Defendants through various broker-dealers.

## FACTS

### I.   HGSI's Expectations for Phase 3 Of The Achieve Trial

30.    In or about August 2007, HGSI began conducting a Phase 3 (late-stage development) clinical trial to test the safety and efficacy of Albuferon, a drug to treat the liver disease hepatitis C (hereinafter, the "Achieve Trial").

31.    The Achieve Trial was administered to over 2,250 patients worldwide, in three arms:  (1) a 900 microgram dose of Albuferon, given once every two weeks; (2) a 1,200 microgram dose of Albuferon, given once every two weeks; and (3) the standard (180 microgram) dose of Pegasys, the then-leading hepatitis C drug on the market, given once a week.

32.    At the 58th Annual Meeting of the American Association for the Study of Liver Diseases held in Boston, Massachusetts from November 2 to November 6, 2007 ("2007 AASLD Conference"), HGSI announced that, if Phase 3 confirmed the findings from Phase 2, HGSI expected to demonstrate that: (1) the 900 microgram dose of Albuferon was just as effective as the standard dose of Pegasys, (2) the 1,200 microgram dose was more effective than the standard dose of Pegasys, and (3) both doses of Albuferon improved the quality of life for patients compared to Pegasys.

33.    Throughout Phase 3, HGSI publicly stated its expectation that, if its Phase 3 trial confirmed the findings of Phase 2, Albuferon could become the "interferon of choice" for the treatment of hepatitis C.  HGSI believed Albuferon had tremendous commercial potential.

### II.   The Hedge Fund Defendants Acquired Positions In HGSI Throughout 2007 Based On A Belief That The Stock Did Not Fully Reflect The Value of Albuferon

34.    From February 1, 2007 through December 3, 2007, the Hedge Fund Defendants purchased approximately 6.2 million shares of HGSI at an average price of $10.32 per share.

11

35. At the time, the investment thesis or rationale for the Hedge Fund Defendants to own HGSI common stock was the co-portfolio managers' belief that the stock price was undervalued and did not fully reflect the competitive opportunities presented by Albuferon. The co-portfolio managers established an internal price target for HGSI shares of $17 per share.

36. At the close of the market on December 3, 2007, the Hedge Fund Defendants collectively owned 6,164,500 shares of HGSI, which were allocated among the funds as follows:

| FrontPoint Fund | HGSI Shares Held on Dec. 3, 2007 |
|---|---|
| FrontPoint Hedge Fund 1 | 1,872,900 |
| FrontPoint Hedge Fund 2 | 1,802,400 |
| FrontPoint Hedge Fund 3 | 193,900 |
| FrontPoint Hedge Fund 4 | 1,379,600 |
| FrontPoint Hedge Fund 5 | 760,400 |
| FrontPoint Hedge Fund 6 | 155,300 |
| **Total** | 6,164,500 |

## III. Benhamou Learned Of Material Non-Public Adverse Events During Phase 3 Of The Achieve Trial

37. On November 12 and 29, 2007, two participants who were receiving the 1,200 microgram dosage of Albuferon in the Achieve Trial developed interstitial lung disease and were hospitalized. One of them died on December 1, 2007.

38. As a member of the Achieve Trial's Steering Committee – a committee of five doctors who were responsible for overseeing the conduct of the Achieve Trial – Benhamou learned of the existence and underlying details of these material non-public adverse events no

later than Saturday, December 1, 2007. He learned at the same time that HGSI's next step was to alert the Achieve Trial's Data Monitoring Committee ("DMC"), an independent committee responsible for overseeing the safety of patients involved in the Achieve Trial. The DMC had the authority to recommend whether to stop, continue or modify the Achieve Trial.

39. Based on its conversations with the DMC, HGSI informed all Steering Committee members between December 7 and December 8, 2007, that the DMC (i) was considering recommending a dose reduction to 900 micrograms for all subjects then being treated with 1,200 micrograms of Albuferon and (ii) would hold a meeting during the week of December 10, 2007 to further review and discuss the data and make a recommendation as to how to proceed with the trial.

40. On Sunday, December 9, 2007, at approximately 8 p.m. EST, HGSI held an urgent phone conference with Benhamou and other Steering Committee members to plan for the upcoming meeting with the DMC. HGSI and the Steering Committee were concerned that the DMC would eliminate the 1,200 microgram arm of the Achieve Trial.

41. Benhamou participated in the December 9 phone conference from Hawaii where he was attending HEP DART 2007, a scientific conference dedicated to the advancement of knowledge about ongoing drug development processes for the treatment of hepatitis B and C. Benhamou and two other Steering Committee members were scheduled to give (and did give) presentations at the conference, on December 11 and 12, 2007.

42. On Monday, December 10, 2007, at 10:44 a.m. EST, HGSI emailed all Steering Committee members a draft proposal – intended for circulation to the DMC in advance of the upcoming meeting – which set forth a plan for the enhanced monitoring of all participants in the Achieve Trial and also recommended obtaining further input from pulmonologists. Between

December 10 and 11, 2007, HGSI, Benhamou and other members of the Steering Committee had multiple communications in which they discussed and revised the proposal for enhanced monitoring and prepared for the upcoming DMC meeting.

43. The DMC meeting took place on Wednesday, December 12, 2007, by teleconference, and occurred in three phases: (i) an initial open session meeting in which the Steering Committee members and various representatives of HGSI and others participated, (ii) a closed session meeting with DMC Committee members only, and (iii) a concluding open session.

44. After hours of deliberation, the DMC decided to allow the Achieve Trial to continue unchanged in order to allow HGSI time to conduct additional pulmonary screening of all trial participants, beginning with patients exhibiting ongoing symptoms of cough and dyspnea. The DMC wanted data on symptomatic patients by Christmas 2007 and stated that, after receiving and reviewing such data, it would reconvene and make its complete recommendation regarding the 1,200 microgram arm.

45. By no later than 10 p.m. EST on December 12, 2007, all members of the Steering Committee were aware of the details of the DMC's non-public recommendation, including its desire to receive additional data by Christmas 2007.

## IV. The November/December 2007 Tip and Trades

46. Benhamou and Skowron attended the 2007 AASLD Conference in Boston. On Sunday, November 4, 2007, while in Boston, they met for dinner. On Tuesday, November 6, 2007, Benhamou had a one-on-one consultation with Skowron.

47. Skowron knew or absent deliberate recklessness should have known at the time that Benhamou was on the Achieve Trial Steering Committee or was otherwise affiliated with

14

the Achieve Trial. Benhamou's name had been publicly associated with the trial previously and his affiliation with the Achieve Trial was publicized at least twice during the 2007 AASLD Conference, as follows:

- On Saturday, November 3, 2007, Benhamou spoke at a seminar in Boston that had been arranged with certain consulting clients who were also attending the 2007 AASLD Conference. There Benhamou discussed, among other topics, the results of Phase 2b of the Achieve Trial.

- On Monday, November 5, 2007, HGSI formally presented the Achieve Trial's Phase 2b final results and its presentation slides identified Benhamou as affiliated with the Achieve Trial.

48. Upon information and belief, on or before December 7, 2007, but after Benhamou learned of the two non-public cases of interstitial lung disease and that the DMC would be notified and make a recommendation affecting the future of the Achieve Trial, Benhamou tipped material, non-public, negative information about the Achieve Trial to Skowron. Skowron, acting pursuant to the authority delegated to him by the Investment Advisor Defendants, caused each of the Hedge Fund Defendants to sell a percentage of their holdings of HGSI common stock based on the information Benhamou tipped to him.

49. On December 10, 2007, after Benhamou learned that the DMC was considering modifying the Achieve Trial's dosage levels and after the Steering Committee and HGSI formulated an action plan for the upcoming DMC meeting, Benhamou called Skowron from the HEP DART 2007 Conference. During that call, Benhamou tipped Skowron additional material non-public information about the Achieve Trial. Skowron knew or absent deliberate recklessness should have known that the information was confidential and was disclosed by Benhamou in breach of his duty to HGSI to keep such information confidential. Nonetheless, acting pursuant to the authority delegated to him by the Investment Advisor Defendants,

Skowron caused the Hedge Fund Defendants to trade on the information that Benhamou tipped to him.

50.     At 2:05 p.m. EST on December 10, 2007, as soon as Skowron finished his call with Benhamou, he called Co-Portfolio Manager 2 and, upon information and belief, caused him to place an order to sell half of the Hedge Fund Defendants' holdings of HGSI common stock. (The approval of only one portfolio manager was needed to reduce the portfolio's risk.)  Co-Portfolio Manager 2 placed the order with Healthcare Trader 1 while he was still on the phone with Skowron.  Immediately thereafter, Skowron emailed Benhamou at the HEP DART 2007 Conference and asked Benhamou to keep the information confidential.

51.     Two days later, on December 12, 2007, Skowron reduced the size of the December 10 sell order.  Before giving Healthcare Trader 1 any instructions, Skowron exchanged the following instant message with Co-Portfolio Manager 3, in which he referenced non-public material information about the Achieve Trial and the hepatitis conference that Benhamou was attending in Hawaii, but also referenced developments with other products in HGSI's pipeline:

| | |
|---|---|
| 9:44:00 a.m. EST | *Skowron*: "i think we should reduce the size of our sale in hgsi to 1/3 instead of 1/2" |
| 9:44:16 a.m. EST | *Skowron*: "interferon's are known to have infections associated with them" |
| 9:44:17 a.m. EST | *Co-Portfolio Mgr. 3*: "reason?" |
| 9:44:28 a.m. EST | *Skowron*: "it's 2 cases in over 4k patients" |
| 9:44:33 a.m. EST | *Co-Portfolio Mgr. 3*: "fair pint" |
| 9:44:35 a.m. EST | *Co-Portfolio Mgr. 3*: "point" |
| 9:44:47 a.m. EST | *Co-Portfolio Mgr. 3*: "plus movement forward with pipeline" |
| 9:44:51 a.m. EST | *Co-Portfolio Mgr. 3*: "GLP and LPPLA2 [two other drugs HGSI was developing, one for the treatment of diabetes, the other for the control and treatment of cardiovascular disease]" |
| 9:44:52 a.m. EST | *Skowron*: "yeah" |

| | |
|---|---|
| 9:44:54 a.m. EST | *Skowron*: "exactly" |
| 9:44:59 a.m. EST | *Skowron*: "people will be bullish on this" |
| 9:45:04 a.m. EST | *Co-Portfolio Mgr. 3*: "agreed" |
| 9:45:17 a.m. EST | *Skowron*: "the meeting is giong [sic] on right now in hawiaii [sic] and no one is saying anything about this" |

Less than a minute later, Skowron instructed Healthcare Trader 1 to sell only one-third of the Hedge Fund Defendants' holdings of HGSI common stock, instead of one-half.

52.     On December 18, 2007, at 2:50 p.m. EST, Skowron cancelled the remainder of the sell order. Earlier that day, HGSI announced positive results relating to a fourth drug in its pipeline, ABthrax, for the treatment of inhalation anthrax; HGSI's stock price and volume were up on the news. But, by then, Healthcare Trader 1 had already sold all but 60,000 shares of the original order, leaving the Hedge Fund Defendants with approximately 3.2 million shares.

53.     Between December 7 and 18, 2007, the Hedge Fund Defendants sold over 2.8 million, or 46 percent, of their shares of HGSI common stock at an average price of $10.65 per share while in the possession of material non-public information concerning HGSI. Each of the Hedge Fund Defendants sold the following number of HGSI shares:

| FrontPoint Fund | HGSI Shares Sold Dec. 7 – 18, 2007 |
|---|---|
| FrontPoint Hedge Fund 1 | 849,829 |
| FrontPoint Hedge Fund 2 | 865,171 |
| FrontPoint Hedge Fund 3 | 88,100 |
| FrontPoint Hedge Fund 4 | 626,000 |
| FrontPoint Hedge Fund 5 | 364,400 |
| FrontPoint Hedge Fund 6 | 81,000 |
| **Total** | 2,874,500 |

54.    Trading in the portfolios of the Hedge Fund Defendants was accomplished as follows: Healthcare Trader 1 would enter instructions to sell a certain percentage of the total HGSI shares held across all of the Hedge Fund Defendants into a computerized order management system.   Once the shares were sold, the system automatically increased or decreased each Fund's position in the stock in accordance with a pre-determined formula.

**V.    Benhamou Learned Date Of The DMC Meeting In Which The DMC Would Deliver Its Final Recommendation**

55.    Shortly after the DMC made its December 12, 2007 recommendation, Benhamou received and was asked to comment on a draft communication that HGSI intended to send to the Achieve Trial investigators, asking them to: (i) run additional pulmonary tests on patients with ongoing cough or dyspnea and to provide the data to HGSI by December 21, 2007; (ii) contact all patients every two weeks to assess for symptoms of cough or dyspnea and bring them in for further evaluation; and (iii) perform pulmonary function tests and chest x-rays on asymptomatic

18

patients in the next four weeks. In his capacity as an investigator, Benhamou received the finalized version of the communication on December 13, 2007 and a follow-up communication that was sent to investigators on December 14, 2007, both of which reiterated that patient visits should be completed and the underlying data faxed to HGSI by December 21. Benhamou knew by then that the DMC would not meet until late December and probably not until January 2008.

56.     Throughout December 2007 and early January 2008, Benhamou and the other Steering Committee members received from HGSI numerous communications regarding the incoming test results, which HGSI told Benhamou it was just starting to receive on January 4, 2008. Benhamou also received and was asked to comment on drafts of an HGSI white paper and presentation slides for the upcoming DMC meeting. By January 8, 2008, the Steering Committee was informed that the DMC would meet on January 17, 2008 to give its recommendation on the Achieve Trial.

57.     Between January 8 and January 18, 2008, Skowron and Benhamou exchanged numerous emails. The emails were mostly social in nature. Skowron told Benhamou that he was "desperately trying to find time to get over to Paris before Milan [where the 43rd annual meeting of the European Association for the Study of the Liver ("EASL 2008") Conference would be held in April 2008]," so he could have dinner with Benhamou. He also invited Benhamou to his home where, according to his email, "the wine sits and waits for us in my cellar!"

58.     Upon information and belief, Benhamou tipped additional material non-public information about the Achieve Trial to Skowron on or before January 17, 2008. On the morning of January 17, 2008, less than four hours before the DMC met, Skowron emailed Benhamou and asked, "Want to touch base today?"

## VI.    **Benhamou Learned Of The Steering Committee's Recommendation**

59.    The DMC meeting took place at 1:30 p.m. EST on Thursday, January 17, 2008, by teleconference, and occurred in three phases: (i) an initial open session meeting in which HGSI, the Steering Committee members, and others participated, (ii) a closed session meeting with DMC members and (iii) a concluding open session.

60.    After more than an hour of closed session deliberations; the DMC recommended that (i) the 1,200 microgram arm of the Achieve Trial be stopped and that all patients receiving that dosage level be given the 900 microgram dose instead and (ii) all patients with interstitial findings on their chest x-rays (of which there were eighteen) be removed from treatment.

61.    Benhamou did not participate in the concluding open session, but, later that afternoon, HGSI emailed him and other Steering Committee members the details of the DMC's recommendation.

## VII.    **The January 2008 Tip and Trades**

62.    On Friday, January 18, 2008, at 9:41 a.m. EST, HGSI sent the Steering Committee members a second email in which HGSI: (i) detailed the DMC recommendation to dose reduce all patients on the 1,200 microgram arm to the 900 microgram arm; (ii) requested guidance from the Steering Committee on how to convey the DMC's recommendation in a letter to investigators and in a press release, a draft of which was to be ready later that day or over the weekend; and (iii) requested guidance from Benhamou on how to address concerns that may be raised by European Union and other global investigators participating in the trial.  HGSI also requested times in which to call Benhamou to discuss the DMC recommendation.

63.    Less than ten minutes after receiving HGSI's email, at 9:49 a.m. EST, Benhamou told HGSI that he was not available and requested a time to call the following day.

20

64.    At 9:50 a.m. EST, exactly one minute after telling HGSI he was not available, Benhamou contacted Skowron and the two had a conversation in which Benhamou tipped additional material negative non-public information about the Achieve Trial to Skowron. Skowron knew or absent deliberate recklessness should have known that the information tipped by Benhamou was confidential and was disclosed by Benhamou in breach of his fiduciary duty to HGSI.

65.    Within minutes of receiving the tip from Benhamou, Skowron caused each of the Hedge Fund Defendants to sell their remaining holdings of HGSI common stock based on the material non-public information Benhamou tipped to him. Specifically, at 9:58 a.m. EST, on January 18, 2008, Skowron instructed Healthcare Trader 1 via instant message to sell all remaining shares of HGSI common stock held by the Hedge Fund Defendants. Skowron was acting pursuant to the authority delegated to him by the Investment Advisor Defendants.

66.    Shortly after receiving Skowron's instructions, Healthcare Trader 1 contacted a certain investment bank ("Investment Bank 1") and asked for a bid to buy all remaining 3.2 million shares of HGSI held by the Hedge Fund Defendants. When Investment Bank 1 came back with a bid of approximately $10 per share, Skowron and Healthcare Trader 1 declined the offer and decided instead to sell the Hedge Fund Defendants' HGSI shares into the market.

67.    By the close of the markets on January 18, 2008, the Hedge Fund Defendants had sold almost 700,000 shares of HGSI common stock at an average price of $10.72 a share. Each of the Hedge Fund Defendants sold the following number of HGSI shares:

| FrontPoint Fund | HGSI Shares Sold on Jan.18, 2008 |
|---|---|
| FrontPoint Hedge Fund 1 | 201,800 |
| FrontPoint Hedge Fund 2 | 199,300 |
| FrontPoint Hedge Fund 3 | 20,800 |
| FrontPoint Hedge Fund 4 | 176,100 |
| FrontPoint Hedge Fund 5 | 84,100 |
| FrontPoint Hedge Fund 6 | 15,800 |
| **Total** | 697,100 |

## VIII. Benhamou Continued To Receive Information About The Timing And Content Of The Press Release And Investigator Letter Throughout The Long Weekend

68.    From January 18, 2008 through Monday, January 21, 2008, Benhamou worked closely with executives at HGSI on (i) the content and logistics of the letter to investigators, which was to be issued simultaneously with HGSI's press release announcing the dose reduction and (ii) HGSI's response to questions that were expected to arise from the public and the Achieve Trial investigators.

69.    Benhamou knew, no later than Friday, January 18, 2008, that HGSI planned to issue its press release during the middle of the following week.  He knew, no later than January 21, 2008, that HGSI would issue its press release on Wednesday, January 23, 2008.

70.    Upon information and belief, Benhamou tipped additional material non-public information about the Achieve Trial to Skowron on or before January 22, 2008.  On the morning of Tuesday, January 22, 2008 – the first trading day after the Martin Luther King Holiday

weekend and the day before HGSI was to issue its press release – Skowron emailed Benhamou and asked, "[A]re you around for a quick call today. Love to catch up."

## IX.   The Other January 2008 Tip And Trade Acceleration

71.   Skowron called Benhamou at 10:44 a.m. EST, on January 22, 2008.  During that call, Benhamou tipped Skowron additional material non-public information about the Achieve Trial.  Skowron knew or absent deliberate recklessness should have known that the information was confidential and was disclosed by Benhamou in breach of his duty to HGSI to keep such information confidential.  Pursuant to the authority delegated to him by the Investment Advisor Defendants, and in response to the information that Benhamou tipped him, Skowron caused the Hedge Fund Defendants to accelerate their sales of HGSI common stock.

72.   While Skowron was still on the telephone with Benhamou, he and Healthcare Trader 1 engaged in the following communication via instant message, in which Skowron indicated, among other things, that he expected HGSI's stock price to drop and instructed the trader to become more aggressive with the sales:

| | |
|---|---|
| 10:49:59 a.m. EST | *Skowron*: "[Healthcare Trader 1], try and get a little more aggressive with hgsi" |
| 10:50:08 a.m. EST | *Healthcare Trader 1*: "ok" |
| 10:50:33 a.m. EST | *Healthcare Trader 1*: "225K out of 980 is pretty aggressive but I hear you" |
| 10:51:12 a.m. EST | *Skowron*: "i show we still own 2.3m shares." |
| 10:51:13 a.m. EST | *Skowron*: "is that right" |
| 10:51:33 a.m. EST | *Healthcare Trader 1*: "yes, we held over 3MM" |
| 10:51:37 a.m. EST | *Skowron*: "ok." |
| 10:51:40 a.m. EST | *Skowron*: "work out of all of it" |
| 10:51:48 a.m. EST | *Healthcare Trader 1*: "i AM TRYING" |
| 10:51:51 a.m. EST | *Skowron*: "oh" |
| 10:51:54 a.m. EST | *Skowron*: "ok" |
| 10:53:01 a.m. EST | *Skowron*: "[Healthcare Trader 1] let's look together at the optino market" |
| 10:53:28 a.m. EST | *Healthcare Trader 1*: "optino?  Is that Latin for options?" |

| 10:53:28 a.m. EST | *Skowron*: "i think this stock could see 7 or 8" |
|---|---|
| 10:54:25 a.m. EST | *Skowron*: "we can sell calls?" |
| 10:55:14 a.m. EST | *Healthcare Trader 1*: "We need to find someone willing to amke [sic] a bid on that many calls and that is problematic in this environment" |

Co-Portfolio Manager 4 saw the instant message and suggested shorting HGSI's debt as a hedge.

73.    Approximately half an hour later, at 11:28 a.m. EST, Benhamou informed Skowron that his daughter would be visiting New York and asked if Skowron could recommend a car service to pick her up at the airport.  Skowron said he would make the arrangements and pay for the car service, and he told Benhamou, "Don't hesitate to let me know if you need anything."

## X.    The Hedge Fund Defendants Sold All Remaining HGSI Shares In A Block Trade At The End Of The Day On January 22, 2008

74.    Throughout the day on January 22, 2008, the Hedge Fund Defendants continued to sell HGSI shares into the market at an average price of $10.37.  Near the end of the trading day, with almost 2 million HGSI shares remaining, Healthcare Trader 1 contacted Investment Bank 1 again and asked for a bid on their remaining shares.  Investment Bank 1 came back with a bid of $9.63 per share for the block trade.  Skowron accepted the offer and all remaining shares of HGSI common stock held by the Hedge Fund Defendants were sold shortly prior to the close of the markets.  The Hedge Funds Defendants' sale of HGSI shares on January 22 comprised 47 percent of the total trading volume in HGSI shares that day.

75.    In anticipation that HGSI's announcement on January 23 would cause HGSI's stock price to decline, Skowron and the other co-portfolio managers instant-messaged each other and expressed relief that the funds had completely sold out of their HGSI position ahead of HGSI's material negative public disclosures:

| | |
|---|---|
| 3:36:12 p.m. EST | *Skowron*: "how did we make out on hgsi?" |
| 3:36:13 p.m. EST | *Skowron*: "net" |
| 3:37:11 p.m. EST | *Healthcare Trader 1*: "we would have been better off hitting the $10 bid" |
| 3:37:17 p.m. EST | *Skowron*: "by how much?" |
| 3:37:32 p.m. EST | *Skowron*: "and in the context of a market meltdown...i'm not concerned about that" |
| 3:37:36 p.m. EST | *Healthcare Trader 1*: "calculating it now" |
| 3:37:42 p.m. EST | *Healthcare Trader 1*: "right" |

\* \* \* \* \*

| | |
|---|---|
| 4:10:50 p.m. EST | *Healthcare Trader 1*: "HGSi we are flat" |
| 4:11:03 p.m. EST | *Co-Portfolio Mgr. 2*: "nice" |
| 4:11:07 p.m. EST | *Co-Portfolio Mgr. 3*: "awesome" |

## XI.   HGSI Issued Its Negative Press Release And The Hedge Fund Defendants Bought HGSI Shares

76.    On January 23, 2008, at 7:00 a.m. EST, HGSI issued its press release concerning the DMC's recommendation and its decision to stop the 1,200 microgram arm of the Achieve Trial. As a result of the announcement, HGSI's share price dropped from $10.02 a share at the close of the previous day, to $5.62 a share at the close of January 23, 2008, a 44 percent decline.

77.    By virtue of having sold all of their holdings (over 6 million shares) of HGSI common stock by the close of the prior day, the Hedge Fund Defendants avoided at least $30 million in losses.

78.    Nonetheless, on the morning of January 23, 2008, Skowron told his co-portfolio managers that he still wanted to own HGSI stock and he recommended that, if HGSI's share price hit $6, they should buy HGSI shares again. Co-Portfolio Manager 2 opined that, if Albuferon proves to be safe at the lower (900 microgram) dose level, then the investment thesis for owning HGSI had not changed.

79.     On January 23, 2008, acting pursuant to the authority delegated to him by the Investment Advisor Defendants, Skowron caused the Hedge Fund Defendants to purchase more than 2.2 million shares of HGSI common stock at an average price of $5.60 per share.  Each of the Hedge Fund Defendants bought the following number of HGSI shares:

| FrontPoint Fund | HGSI Shares Purchased on Jan. 23, 2008 |
|---|---|
| FrontPoint Hedge Fund 1 | 763,541 |
| FrontPoint Hedge Fund 2 | 439,400 |
| FrontPoint Hedge Fund 3 | 79,200 |
| FrontPoint Hedge Fund 4 | 666,900 |
| FrontPoint Hedge Fund 5 | 489,700 |
| FrontPoint Hedge Fund 6 | 0 |
| **Total** | 2,438,741 |

The Hedge Fund Defendants continued to purchase shares of HGSI common stock in the ensuing days.

## XII.    The SEC And USA Bring Civil and Criminal Charges Against Benhamou

80.     On November 2, 2010, the Securities and Exchange Commission ("SEC") filed a complaint in the United States District Court for the Southern District of New York against Benhamou.  The SEC charged Benhamou with unlawfully tipping inside information concerning HGSI's clinical trial for Albuferon in advance of HGSI's negative announcement on January 23, 2008.   Specifically, the SEC alleged that Benhamou violated the antifraud provisions of the federal securities laws, Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a) and

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

81.     Also on November 2, 2010, the United States Attorney's Office filed a parallel criminal action, also in the United States District Court for the Southern District of New York, against Benhamou. In the complaint, the United States alleges, based on similar allegations to those contained in the SEC's complaint, that Benhamou conspired to commit, and committed, securities fraud.

## XIII.   **Skowron Is Placed On Leave By FrontPoint**

82.     Although the federal government's civil and criminal complaints against Benhamou did not identify Skowron, FrontPoint or the Hedge Fund defendants by name, on November 5, 2010, Morgan Stanley and FrontPoint have publicly confirmed that the healthcare hedge funds referenced in the SEC and criminal complaints against Benhamou are FrontPoint healthcare funds.  A FrontPoint spokesman also announced that Skowron, the manager of the Hedge Fund Defendants, had been placed on leave.

## **CLASS ACTION ALLEGATIONS**

83.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased shares of HGSI from December 7, 2007 through January 22, 2008, the "Class Period" (the "Class"). Excluded from the Class are (1) Defendants; (2) members of the immediate family of the individual Defendants; (3) any subsidiaries or affiliates of the Defendants; (4) any person or entity who is, or was during the Class Period, an investor in or a partner, officer, director, employee or controlling person of the Defendants; (5) any entity in which any of the Defendants has a

controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

84. The members of the Class are so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of Class members, Plaintiffs believe that there are many hundreds of members of the Class who purchased shares of HGSI common stock contemporaneously with the sale of HGSI common stock by Defendants during the Class Period.

85. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

86. Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

> a. Whether the federal securities laws were violated by the Defendants' acts as alleged herein;
>
> b. Whether the Defendants engaged in manipulative or deceptive devices or schemes to defraud in violation of Section 10(b) or the Exchange Act and Rule 10b-5;
>
> c. Whether the Defendants are liable to the Plaintiffs and the Class for insider trading pursuant to § 20A of the Exchange Act;
>
> d. Whether FrontPoint, the Investment Advisor Defendants and Skowron are liable to the Plaintiffs and the Class as "controlling persons" of the Hedge Fund Defendants pursuant to § 20(a) of the Exchange Act;

e. The relief to which Plaintiffs and the members of the Class are entitled, including disgorgement, constructive trust and an accounting.

87.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

88.    A class action is superior to other available methods for fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, the expense and burden of individual litigation make it impossible for the Class members individually to redress the Defendants' wrongful conduct. Furthermore, Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

**COUNT I**

**FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**

(Against All of the Defendants)

89.    Plaintiffs repeat and reallege each of the allegations set forth above.

90.    The conduct of the Defendants, as set forth above, constituted a manipulative and deceptive device and a scheme to defraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.    The facts alleged herein give rise to a strong inference that the Defendants acted with scienter. For example, as set forth above, Skowron knew or absent deliberate recklessness should have known that Benhamou served on the trial's Steering Committee and owed a duty of confidentiality to HGSI, but, nonetheless, he on numerous occasions caused the Hedge Fund

Defendants to sell the holdings of HGSI common stock while in possession of material non-public information from Benhamou.

92. As described above, all of the actions of all of the Defendants herein, except Benhamou, in connection with the sale of Hedge Fund Defendants' HGSI stock during the Class Period were initiated, caused and directed by Skowron, who was an officer, director or authorized agent of all of the Defendants herein, except Benhamou. Accordingly, Skowron's scienter is imputed to all of the other Defendants except Benhamou.

93. Plaintiffs and Class members purchased shares of HGSI common stock contemporaneous with Hedge Fund Defendants' sales of HGSI common stock during the Class Period and relied on participants in the marketplace to trade based on public information. The Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder caused Plaintiffs and Class members economic loss.

94. The Defendants, except Benhamou, also violated section 10(b) of the Exchange Act and Rule 10b-5 as "tippees." They possessed material non-public information regarding HGSI, which the tipper, Benhamou, disclosed to them. The tippees, all of the Defendants except Benhamou, traded or caused the Hedge Fund Defendants to trade in HGSI stock during the Class Period while in possession of the non-public information provided by Benhamou. Those Defendants knew or should have known that Benhamou had violated a relationship of trust by relaying the information and that Benhamou benefited from the disclosures to the Defendants through the compensation he received as a result of his consulting relationship and arrangements with the Defendants.

95. Defendant Benhamou is liable under section 10(b) of the Exchange Act and Rule 10b-5. He possessed confidential, material, non-public information regarding HGSI's trial of

Albuferon.  Benhamou acted with scienter.  Benhamou knew, should have known, or recklessly disregarded that the information he possessed was highly confidential and could materially affect the marketplace for HGSI shares.  Yet on numerous occasions he tipped that information to Skowron, with whom he had a consulting relationship and friendship, with the expectation of receiving a benefit.  In making these disclosures, Benhamou violated fiduciary duties or similar duties of trust and confidence to HGSI and its shareholders.  Benhamou knew or should have known that Skowron managed trades on behalf of the Hedge Fund Defendants and that Skowron was using the confidential, non-public adverse information he was providing to Skowron to unlawfully sell shares in HGSI.  Benhamou is thus liable for the Hedge Fund Defendants' trades – directly or indirectly – because he unlawfully tipped material non-public information to Skowron, who effected trades on behalf of the Hedge Fund Defendants, controlled the funds and/or unlawfully tipped the information to all of the Defendants herein, except Benhamou.

## COUNT II

### FOR LIABILITY UNDER SECTION 20A OF THE EXCHANGE ACT

(Against All of the Defendants)

96.     Plaintiffs repeat and reallege each of the allegations set forth above.

97.     The claims set forth herein are brought under Section 20A of the Exchange Act against all of the Defendants in connection with their insider trading of HGSI stock.

98.     The Defendants (excluding Benhamou) knowingly or with deliberate recklessness sold or caused to be sold over six million shares of HGSI stock during the Class Period while in the possession of material, adverse, inside, non-public information and thereby avoiding at least $30 million in losses.  Plaintiffs and the Class purchased HGSI stock contemporaneous with the Hedge Fund Defendants' sales.

99.     Pursuant to Section 20A(a) of the Exchange Act, the Defendants are liable to the Plaintiffs and the Class for all losses avoided by the Hedge Fund Defendants' sales of HGSI stock during the Class Period.  Plaintiffs and the Class are also entitled to the return of the amounts by which Defendants have been unjustly enriched through their sales of HGSI shares during the Class Period and to disgorgement, a constructive trust and an accounting.

100.     Pursuant to Sections 20A(a) and (c) of the Exchange Act, Benhamou, by violating Section 10(b) of the Exchange Act and Rule 10b-5 by communicating material non-public information about HGSI to Skowron and the Hedge Fund Defendants, is jointly and severally liable with, and to the same extent as, the Hedge Fund Defendants.

## COUNT III

### FOR CONTROL PERSON LIABILITY UNDER SECTION 20(a)<br>OF THE EXCHANGE ACT

(Against FrontPoint, the Investment Advisor Defendants and Skowron)

101.     Plaintiffs repeat and reallege each of the allegations set forth above.

102.     This Count is brought against FrontPoint, the Investment Advisor Defendants and Skowron (collectively, the "Control Person Defendants") for control person liability under Section 20(a) of the Exchange Act.

103.     Under Section 20(a) of the Exchange Act, "Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

104.    Each of the Control Person Defendants controlled the Hedge Fund Defendants by virtue of their positions as investment advisors of and/or portfolio managers of the Hedge Fund Defendants. Each of the Control Person Defendants in fact exercised control over the Hedge Fund Defendants in connection with the sales of HGSI stock alleged herein.

105.    By virtue of their positions as controlling persons of the Hedge Fund Defendants, and their conduct in causing the Hedge Fund Defendants to sell their shares of HGSI during the Class Period while in possession of material, adverse information about HGSI, the Control Person Defendants are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to the Plaintiffs and the Class with the Hedge Fund Defendants for the Hedge Fund Defendants' liability under Counts I and II above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.  Declaring this action to be a proper Class action pursuant to Fed. R. Civ. P. 23;

B.  Awarding compensatory damages against all of the Defendants, jointly and severally, in favor of Plaintiffs for all losses and damages suffered as a result of the Defendants' wrongdoing alleged herein, in an amount to be determined at trial, together with interest thereon;

C.  Ordering Defendants to return the amounts by which they have been unjustly enriched;

D.  Awarding disgorgement of all profits, benefits and other compensation obtained by the Defendants as a result of Defendants' misconduct alleged herein;

E.  Imposing a constructive trust for the benefit of Plaintiffs and Class members on all of Defendants' ill-gotten gains and proceeds as a result of Defendants' misconduct alleged herein;

F.  Ordering a certified accounting of the Defendants' books and records to determine the correct compensation owed to Plaintiffs and Class members as a result of Defendants' misconduct alleged herein;

G.  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including a reasonable allowance of fees for Plaintiffs' attorneys and experts; and

H.  Awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Respectfully Submitted,                     **PLAINTIFFS,**

Jeffrey S. Nobel (CT 04855)

Nancy A. Kulesa (CT 25384)

Izard Nobel LLP

29 South Main Street, Suite 215

West Hartford, CT 06107

Telephone:  (860) 493-6292

Facsimile:  (860) 493-6290

jnobel@izardnobel.com

nkulesa@izardnobel.com

*Of Counsel:*

Edward F. Haber

Michelle H. Blauner

Ian McLoughlin

34

Rachel Brown

Shapiro Haber & Urmy LLP

53 State Street

Boston, MA 02109

Telephone: (617) 439-3939

Facsimile:  (617) 439-0134

ehaber@shulaw.com

mblauner@shulaw.com

imcloughlin@shulaw.com

rbrown@shulaw.com

Paul Paradis

Michael A. Schwartz

Horwitz Horwitz & Paradis

405 Lexington Avenue, 61st Floor

New York, NY 100174

Telephone: (212) 986-4500

Facsimile: (212) 986-4501

pparadis@hhplawny.com

mschwartz@hhplawny.com

CERTIFICATION OF ALBERT AND EVELYN BRODZINSKY
PURSUANT TO FEDERAL SECURITIES LAWS

We, Albert and Evelyn Brodzinsky, hereby certify that:

1. We have reviewed the complaint in the action entitled *Brodzinsky v. Benhamou, et al.*, to be filed in the United States District Court for the District of Connecticut and authorized its filing.

2. We did not acquire the security that is the subject of this action at the direction of our counsel or in order to participate in this private action or any other litigation under the federal securities law.

3. We are willing to serve as representative parties on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. We made the following transaction(s) during the Class Period in the common stock of Human Genome Sciences, Inc.:

| Transaction | Date | Number of Shares | Price per Share | Commission | Total Cost of Transaction |
|---|---|---|---|---|---|
| Purchase | 1/3/2008 | 1,000 | $11.3299 | $9.99 | $11,339.89 |

5. We have neither sought to serve nor served as representative parties for a class in an action filed under the federal securities laws during the three years prior to the date of this Certification, except as listed below:

   NONE

6. We will not accept any payment for serving as representative parties on behalf of the class beyond our pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

Signed under the penalties of perjury this 29th day of December, 2010.

_Albert Brodzinsky_
Albert Brodzinsky

_Evelyn Brodzinsky_
Evelyn Brodzinsky