

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

DR. YVES M. BENHAMOU,

Defendant.

10 Civ.-_____( )

**ECF CASE**

## COMPLAINT AND JURY DEMAND

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## INTRODUCTION

1.      Over a six week period in December 2007 and January 2008, six healthcare-related hedge funds sold approximately 6 million shares of Human Genome Sciences, Inc. ("HGSI") common stock while their portfolio manager possessed material negative non-public information concerning HGSI's clinical trial for the drug Albumin Interferon Alfa 2-a ("Albuferon").

2.      The portfolio manager's information came from Dr. Yves Benhamou ("Benhamou"), one of five members of a Steering Committee overseeing the Albuferon trial, who, at the same time, had a consulting relationship with hedge funds and other investors that purchased and sold healthcare-related securities. Benhamou provided consulting services to the portfolio manager – and the investment advisors and hedge funds with which the portfolio manager was affiliated – on multiple occasions since at least 2006; indeed, a hedge fund sponsor affiliated with the portfolio manager paid substantial fees to the company for which Benhamou worked as a consultant so that the portfolio manager and others could consult with experts in the healthcare

1

sector. Benhamou and the portfolio manager also developed a friendship over the years and, in fact, many of Benhamou's consults with the portfolio manager were informal.

3. Commencing in November 2007, and on multiple occasions prior to January 23, 2008, Benhamou learned material non-public information about the Albuferon trial that had negative implications for Albuferon's future commercial potential. He communicated such information to the portfolio manager in violation of his duty to HGSI to keep the information confidential. The portfolio manager knew or should have known that Benhamou served on the trial's Steering Committee and owed a duty of confidentiality to HGSI, but, nonetheless, he immediately took action to sell the hedge funds' holdings of HGSI common stock. On key dates prior to HGSI's announcement of negative news concerning the trial, including minutes before the close of the markets on January 22, 2008, the portfolio manager, acting under the authority delegated to him by the investment advisors for the six hedge funds, caused those hedge funds to sell all of their remaining holdings of HGSI common stock.

4. On January 23, 2008, HGSI publicly announced that all patients who had been administered the higher dosage level of Albuferon in its clinical trial would be moved to the lower dosage level due to a safety issue detected during Phase 3 of the trial. The higher dosage level was believed, until then, to have greater commercial potential than the lower dosage. In response to HGSI's announcement, the market price of HGSI's common stock fell by approximately 44 percent, to $5.62 a share by the close of the markets that day.

5. Overall, the hedge funds sold approximately 6 million shares of HGSI common stock – representing all of their holdings – thereby avoiding at least $30 million in losses. They went back into the market after HGSI made its public announcement and purchased more shares of HGSI common stock, at a reduced price.

2

6.     By this conduct, Benhamou violated the antifraud provisions of the federal securities laws, including Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and is liable for the ill-gotten gains of his tippee the portfolio manager and any downstream tippees, including the six hedge funds.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this matter pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Venue is proper because certain of the acts, practices, transactions and courses of business constituting the violations alleged herein occurred within this judicial district.

## THE DEFENDANT

8.     **Yves Benhamou, M.D. ("Benhamou")**, age 49, is a citizen and resident of France, and a medical doctor specializing in hepatitis and other diseases of the liver. Throughout the period covered by this Complaint, Benhamou was the Chief of Department, Clinical Research in Hepatology, Hôpitaux de Paris–Pitié-Salpétrière and an Associate Professor of Hepatology at the Hôpitaux de Paris–Pitié-Salpétrière in Paris, France. He was also a clinical investigative physician for HGSI and was involved with the clinical trial for Albuferon in two capacities: (i) he served on the Steering Committee that oversaw the trial and (ii) he was a "country lead investigator" for France and other parts of Europe. By virtue of his role in the clinical trial, and in accordance with the terms of his contract with HGSI, Benhamou owed HGSI a duty to hold in strict confidence all information learned in connection with his participation in the clinical trial

and to use such information only for the benefit of HGSI. While serving on the Steering Committee, Benhamou also had a consulting relationship with hedge funds and other investors that purchased and sold healthcare-related securities. Agreements that he signed in connection with the consulting business prohibited him from disclosing any confidential information (including confidential information learned from clinical trials) to his consulting clients.

## OTHER RELEVANT PERSONS AND ENTITIES

9. **Human Genome Sciences, Inc. ("HGSI")** is a biopharmaceutical company that is incorporated in Delaware and headquartered in Rockville, Maryland. HGSI's common stock is registered with the Commission pursuant to Exchange Act Section 12(b), and quoted on the NASDAQ Global Market under the ticker symbol HGSI.

10. **Co-Portfolio Manager 1** is, and throughout the period covered by this Complaint was, a Managing Director of an investment bank ("Investment Bank 1"), an executive officer of six investment advisors affiliated with a subsidiary of Investment Bank 1, and a co-portfolio manager of six healthcare-related hedge funds. Co-Portfolio Manager 1 worked in the Connecticut and New York offices of a hedge fund sponsor that was a subsidiary of Investment Bank 1. Investment Bank 1's Code of Conduct and the subsidiary's Employee Trading Policy and Code of Ethics prohibited Co-Portfolio Manager 1 from trading, personally or on behalf of clients, on the basis of material non-public information or communicating material, non-public information to others. Co-Portfolio Manager 1's compensation for 2007 and 2008 was linked to the performance of the hedge funds that he managed and the fees earned by the funds' investment advisor/management company.

11. **Co-Portfolio Managers 2, 3 and 4** are, and throughout the period covered by this Complaint were, Managing Directors of Investment Bank 1. Co-Portfolio Managers 2 and 3

4

worked principally out of the New York offices of Investment Bank 1's subsidiary and, with Co-Portfolio Manager 1, were executive officers of the six investment advisors and co-portfolio managers of the six healthcare-related hedge funds. Co-Portfolio Manager 4 worked principally out of the subsidiary's Connecticut offices and, with Co-Portfolio Managers 1, 2 and 3, was an executive officer of two of the investment advisors and a co-portfolio manager of two of the healthcare-related hedge funds.

12. **Healthcare Trader 1** is a trader for Investment Bank 1's subsidiary who, during the relevant time period, accepted trade orders from Co-Portfolio Managers 1, 2, 3 and 4 and submitted trades for the six healthcare funds through various broker-dealers.

13. **Investment Advisor 1**, a Delaware limited liability company, was the General Partner of and provided investment advice and management services to Hedge Fund 1. Co-Portfolio Manager 1 was an executive officer of Investment Advisor 1.

14. **Investment Advisor 2**, a Delaware limited liability company, was the General Partner of and provided investment advice and management services to Hedge Fund 2. Co-Portfolio Manager 1 was an executive officer of Investment Advisor 2.

15. **Investment Advisor 3**, an investment advisor registered under the U.S. Investment Advisors Act of 1940, was the General Partner of and provided investment advice and management services to Hedge Fund 3. Co-Portfolio Manager 1 was an executive officer of Investment Advisor 3.

16. **Investment Advisor 4,** a Delaware limited liability company, was the General Partner of and provided investment advice and management services to Hedge Fund 4. Portfolio Manager 1 was an executive officer of Investment Advisor 4.

17.     **Investment Advisor 5**, an investment advisor registered under the U.S. Investment Advisors Act of 1940, was the General Partner of and provided investment advice and management services to Hedge Fund 5.  Co-Portfolio Manager 1 was an executive officer of Investment Advisor 5.

18.     **Investment Advisor 6,** a Delaware limited liability company, was the General Partner of and provided investment advice and management services to Hedge Fund 6.  Co-Portfolio Manager 1 was an executive officer of Investment Advisor 6.

19.     **Investment Advisors 1 through 6** are hereinafter referred to, in the collective, as the **"Healthcare Fund Advisors."**

20.     **Hedge Fund 1** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  Co-Portfolio Manager 1 is, and at all times covered by this Complaint was, a co-portfolio manager of this fund and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments.

21.     **Hedge Fund 2** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  It seeks to have a longer investment horizon than Hedge Fund 1.  Co-Portfolio Manager 1 is, and at all times covered by this Complaint was, a co-portfolio manager of the Hedge Fund 2 and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments.  Co-Portfolio Manager 1 was also a limited partner of and personally invested in this fund.

6

22.    **Hedge Fund 3** is a Delaware limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  It has a similar horizon and strategy to Hedge Fund 1 except it contains assets subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").  Co-Portfolio Manager 1 is, and at all times covered by this Complaint was, a co-portfolio manager of Hedge Fund 3 and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments.

23.    **Hedge Fund 4** is a Cayman Islands exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  It seeks to replicate the portfolio of Hedge Fund 1 but employs substantially more leverage to target a gross exposure and net exposure that is two times that of Hedge Fund 1 at the beginning of each month.  Co-Portfolio Manager 1 is, and at all times relevant to this Complaint was, a co-portfolio manager of this fund and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments. Co-Portfolio Manager 1 was also personally invested in this fund through its onshore feeder fund, of which he is a limited partner.

24.    **Hedge Fund 5** is a Cayman Island exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States.  It seeks to employ the same investment process and approach as the Hedge Fund 2 but to have a longer investment horizon and greater variability in its net exposure to the market over time.  Co-Portfolio Manager

1 is, and at all times relevant to this Complaint was, a co-portfolio manager of this fund and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments. Co-Portfolio Manager 1 was also personally invested in this fund through its onshore feeder fund, of which he is a limited partner.

25.    **Hedge Fund 6** is a Cayman Islands exempted limited partnership whose stated investment strategy is to take long and short positions primarily in equity securities of healthcare and healthcare-related companies predominantly in the United States. Co-Portfolio Manager 1 is, and at all times relevant to this Complaint was, a co-portfolio manager of this fund and, in his capacity as an executive officer of the fund's general partner, had discretionary authority to select trades and determine the allocation of the fund's investments.

26.    **Hedge Funds 1 through 6** are hereinafter referred to, in the collective, as the **"Healthcare Funds."**

## FACTS

**I.    HGSI's Expectations for Phase 3 Of The Achieve Trial**

27.    In or about August 2007, HGSI began conducting a Phase 3 (late-stage development) clinical trial to test the safety and efficacy of Albuferon, a drug to treat the liver disease Hepatitis C (hereinafter, the "Achieve Trial").

28.    The Achieve Trial was administered to over 2250 patients worldwide, in three arms: (1) a 900 microgram dose of Albuferon, given once every two weeks; (2) a 1200 microgram dose of Albuferon, given once every two weeks; and (3) the standard (180 microgram) dose of Pegasys, the then-leading hepatitis C drug on the market, given once a week.

8

29.    At the 58th Annual Meeting of the American Association for the Study of Liver Diseases held in Boston, Massachusetts from November 2 to November 6, 2007 ("2007 AASLD Conference"), HGSI announced that, if Phase 3 confirmed the findings from Phase 2, it expected to demonstrate that the 900 microgram dose of Albuferon was just as effective as the standard dose of Pegasys, the 1200 microgram dose was more effective than the standard dose of Pegasys, and both doses of Albuferon improved the quality of life for patients compared to Pegasys.

30.    Throughout Phase 3, HGSI publicly stated its expectation that, if its Phase 3 trial confirmed the findings of Phase 2, Albuferon could become the "interferon of choice" for the treatment of hepatitis C.  HGSI believed Albuferon had tremendous commercial potential.

## II.    The Healthcare Funds Acquired Positions In HGSI Throughout 2007 Based On A Belief That The Stock Did Not Fully Reflect The Value Of Albuferon

31.    From February 1, 2007 through December 3, 2007, the Healthcare Funds purchased approximately 6.2 million shares of HGSI at an average price of $10.32 per share.

32.    At the time, the investment thesis or rationale for the Healthcare Funds to own HGSI common stock was the co-portfolio managers' belief that the stock price was undervalued and did not fully reflect the competitive opportunities presented by Albuferon.  The co-portfolio managers established an internal price target for HGSI shares of $17 per share.

33.    At the close of the market on December 3, 2007, the Healthcare Funds collectively owned 6,164,500 shares of HGSI, which were allocated among the funds as follows:

| Fund | Shares Held Dec. 3, 2007 |
|------|-------------------------|
| Hedge Fund 1 | 1,872,900 |
| Hedge Fund 2 | 1,802,400 |
| Hedge Fund 3 | 193,900 |
| Hedge Fund 4 | 1,379,600 |

| Fund | Shares Held Dec. 3, 2007 |
|------|--------------------------|
| Hedge Fund 5 | 760,400 |
| Hedge Fund 6 | 155,300 |
| **Total** | 6,164,500 |

### III.   Benhamou Learned Of Serious Adverse Events During Phase 3 Of The Achieve Trial

34.   On November 12 and 29, 2007, two participants who were receiving the 1200 microgram dosage of Albuferon in the Achieve Trial developed interstitial lung disease and were hospitalized. One of them died on December 1, 2007.

35.   As a member of the Achieve Trial's Steering Committee – a committee of five doctors who were responsible for overseeing the conduct of the Achieve Trial – Benhamou learned of the existence and underlying details of these serious adverse events ("SAEs") no later than Saturday, December 1, 2007. He learned at the same time that HGSI's next step was to alert the Achieve Trial's Data Monitoring Committee ("DMC"), an independent committee responsible for overseeing the safety of patients involved in the Achieve Trial. The DMC had the authority to recommend whether to stop, continue or modify the Achieve Trial.

36.   Based on its conversations with the DMC, HGSI informed all Steering Committee members between December 7 and December 8, 2007, that the DMC (i) was considering recommending a dose reduction to 900 micrograms for all subjects then being treated with 1200 micrograms of Albuferon and (ii) would hold a meeting during the week of December 10, 2007 to further review and discuss the data and make a recommendation as to how to proceed with the trial.

37.   On Sunday, December 9, 2007, at approximately 8 p.m. EST, HGSI held an urgent phone conference with Benhamou and other Steering Committee members to plan for the

upcoming meeting with the DMC. HGSI and the Steering Committee were concerned that the DMC would eliminate the 1200 microgram arm of the Achieve Trial without fully considering all relevant data. In an effort to assist the DMC in making an informed decision – and to further ensure the safety of patients on the 1200 microgram arm – they discussed, among other things, putting in place an enhanced patient monitoring plan with intensified focus on patients with cough and dyspnea.

38.     Benhamou participated in the December 9 phone conference from Hawaii where he was attending HEP DART 2007, a scientific conference dedicated to the advancement of knowledge about ongoing drug development processes for the treatment of hepatitis B and C. Benhamou and two other Steering Committee members were scheduled to give (and did give) presentations at the conference, on December 11 and 12, 2007.

39.     On Monday, December 10, 2007, at 10:44 a.m., EST, HGSI emailed all Steering Committee members a draft proposal – intended for circulation to the DMC in advance of the upcoming meeting – which set forth a plan for the enhanced monitoring of all participants in the Achieve Trial and also recommended obtaining further input from pulmonologists. Between December 10 and 11, 2007, HGSI, Benhamou and other members of the Steering Committee had multiple communications in which they discussed and revised the proposal for enhanced monitoring and prepared for the upcoming DMC meeting.

40.     The DMC meeting took place on Wednesday, December 12, 2007, by teleconference, and occurred in three phases: (i) an initial open session meeting in which the Steering Committee members and various representatives of HGSI and others participated, (ii) a closed session meeting with DMC Committee members only, and (iii) a concluding open session.

11

41.     After hours of deliberation, the DMC decided to allow the Achieve Trial to continue unchanged in order to allow HGSI time to conduct additional pulmonary screening of all trial participants, beginning with patients exhibiting ongoing symptoms of cough and dyspnea.  The DMC wanted data on symptomatic patients by Christmas 2007 and stated that, after receiving and reviewing such data, it would reconvene and make its complete recommendation regarding the 1200 mcg arm.

42.     By no later than 10 p.m. EST on December 12, 2007, all members of the Steering Committee were aware of the details of the DMC's recommendation, including its desire to receive additional data by Christmas 2007.

## IV.     The November/December 2007 Tip and Trades

43.     Benhamou and Co-Portfolio Manager 1 attended the 2007 AASLD Conference in Boston.  On Sunday, November 4, 2007, while in Boston, they met for dinner.  On Tuesday, November 6, 2007, Benhamou had a one-on-one consultation with Co-Portfolio Manager 1.

44.     Co-Portfolio Manager 1 knew or should have known at the time that Benhamou was on the Achieve Trial Steering Committee or was otherwise affiliated with the Achieve Trial. Benhamou's name had been publicly associated with the trial previously and his affiliation with the Achieve Trial was publicized at least twice during the 2007 AASLD Conference:

- On Saturday, November 3, 2007, Benhamou spoke at a seminar in Boston that had been arranged with certain consulting clients who were also attending the 2007 AASLD Conference.  There Benhamou discussed, among other topics, the results of Phase 2b of the Achieve Trial.

- On Monday, November 5, 2007, HGSI formally presented the results the Achieve Trial's Phase 2b final results and its presentation slides identified Benhamou as affiliated with the Achieve Trial.

45.     Upon information and belief, on or before December 7, 2007, but after Benhamou learned of the two cases of interstitial lung disease and that the DMC would be notified and

make a recommendation affecting the future of the Achieve Trial, Benhamou tipped material, non-public, negative information about the Achieve Trial to Co-Portfolio Manager 1. Co-Portfolio Manager 1, acting pursuant to the authority delegated to him by the Healthcare Fund Advisors, caused each of the Healthcare Funds to sell a small percentage of their holdings of HGSI common stock based on the information Benhamou tipped to him.

46.     On December 10, 2007, after Benhamou learned that the DMC was considering modifying the Achieve Trial's dosage levels and after the Steering Committee and HGSI formulated an action plan for the upcoming DMC meeting, Benhamou called Co-Portfolio Manager 1 from the HEP DART 2007 Conference. During that call, Benhamou tipped Co-Portfolio Manager 1 additional material non-public information about the Achieve Trial. Co-Portfolio Manager 1 knew or should have known that the information was confidential and was disclosed by Benhamou in breach of his duty to HGSI to keep such information confidential. Nonetheless, acting pursuant to the authority delegated to him by the Healthcare Fund Advisors, Co-Portfolio Manager 1 caused the Healthcare Funds to trade on the information that Benhamou tipped to him.

47.     At 2:05 p.m. EST, on December 10, 2007, as soon as Co-Portfolio Manager 1 finished his call with Benhamou, he called Co-Portfolio Manager 2 and, upon information and belief, caused him to place an order to sell half of the Healthcare Funds' holdings of HGSI common stock. (The approval of only one portfolio manager was needed to reduce the portfolio's risk.) Co-Portfolio Manager 2, who was in New York at the time, placed the order with Healthcare Trader 1 while he was still on the phone with Co-Portfolio Manager 1. Immediately thereafter, Co-Portfolio Manager 1 emailed Benhamou at the HEP DART 2007 Conference and asked Benhamou to keep the information confidential.

48.     Two days later, on December 12, 2007, Co-Portfolio Manager 1 reduced the size of the December 10 sell order. Before giving Healthcare Trader 1 any instructions, Co-Portfolio Manager 1 exchanged the following instant message with Co-Portfolio Manager 3, in which he referenced non-public information about the Achieve Trial and the hepatitis conference that Benhamou was attending in Hawaii, but also referenced developments with other products in HGSI's pipeline:

| | |
|---|---|
| 9:44:00 a.m. EST | *Co-Portfolio Mgr. 1:* "i think we should reduce the size of our sale in hgsi to 1/3 instead of 1/2" |
| 9:44:16 a.m. EST | *Co-Portfolio Mgr. 1:* "interferon's are known to have infections associated with them" |
| 9:44:17 a.m. EST | *Co-Portfolio Mgr. 3:* "reason?" |
| 9:44:28 a.m. EST | *Co-Portfolio Mgr. 1:* "it's 2 cases in over 4k patients" |
| 9:44:33 a.m. EST | *Co-Portfolio Mgr. 3:* "fair pint" |
| 9:44:35 a.m. EST | *Co-Portfolio Mgr. 3:* "point" |
| 9:44:47 a.m. EST | *Co-Portfolio Mgr. 3:* "plus movement forward with pipeline" |
| 9:44:51 a.m. EST | *Co-Portfolio Mgr. 3:* "GLP and LPPLA2 [two other drugs HGSI was developing, one for the treatment of diabetes, the other for the control and treatment of cardiovascular disease]" |
| 9:44:52 a.m. EST | *Co-Portfolio Mgr. 1:* "yeah" |
| 9:44:54 a.m. EST | *Co-Portfolio Mgr. 1:* "exactly" |
| 9:44:59 a.m. EST | *Co-Portfolio Mgr. 1:* "people will be bullish on this" |
| 9:45:04 a.m. EST | *Co-Portfolio Mgr. 3:* "agreed" |
| 9:45:17 a.m. EST | *Co-Portfolio Mgr. 1:* "the meeting is giong [sic] on right now in hawiaii [sic] and no one is saying anything about this" |

Less than a minute later, Co-Portfolio Manager 1 instructed Healthcare Trader 1 to sell only one-third of the Healthcare Funds' holdings of HGSI common stock, instead of one-half.

49.     On December 18, 2007, at 2:50 p.m. EST, Co-Portfolio Manager 1 cancelled the remainder of the sell order. Earlier that day, HGSI announced positive results relating to a fourth drug in its pipeline, ABthrax, for the treatment of inhalation anthrax; HGSI's stock price and

volume were up on the news. But, by then, Healthcare Trader 1 had already sold all but 60,000 shares of the original order, leaving the Healthcare Funds with approximately 3.2 million shares.

50.     Between December 7 and 18, 2007, the Healthcare Funds sold 2.8 million, or 46 percent, of their shares of HGSI common stock at an average price of $10.65 per share.

| Fund | Shares Sold Dec. 7 – 18, 2007 |
| --- | --- |
| Hedge Fund 1 | 849,829 |
| Hedge Fund 2 | 865,171 |
| Hedge Fund 3 | 88,100 |
| Hedge Fund 4 | 626,000 |
| Hedge Fund 5 | 364,400 |
| Hedge Fund 6 | 81,000 |
| **Totals** | 2,874,500 |

51.     Trading in the portfolios of the Healthcare Funds was accomplished as follows: Healthcare Trader 1 would enter into a computerized order management system instructions to sell a certain percentage of the total HGSI shares held across all of the Healthcare Funds. Once the shares were sold, the system automatically increased or decreased each Fund's position in the stock in accordance with a pre-determined formula.

## VI.     Benhamou Learned Date Of The DMC Meeting In Which The DMC Would Deliver Its Final Recommendation

52.     Shortly after the DMC made its December 12, 2007 recommendation, Benhamou received and was asked to comment on a draft communication that HGSI intended to send to the Achieve Trial investigators, asking them to: (i) run additional pulmonary tests on patients with ongoing cough or dyspnea and to provide the data to HGSI by December 21, 2007; (ii) contact

15

all patients every two weeks to assess for symptoms of cough or dyspnea and bring them in for further evaluation; and (iii) perform pulmonary function tests and chest x-rays on asymptomatic patients in the next four weeks. In his capacity as an investigator, he received the finalized version of the communication on December 13, 2007 and a follow-up communication that was sent to investigators on December 14, 2007, both of which reiterated that patient visits should be completed and the underlying data faxed to HGSI by December 21. Benhamou knew by then that the DMC would not meet until late December and, even then, probably not until January 2008.

53. Throughout December 2007 and early January 2008, Benhamou and the other Steering Committee members received from HGSI numerous communications regarding the incoming test results, which HGSI told Benhamou it was just starting to receive on January 4, 2008. Benhamou also received and was asked to comment on drafts of an HGSI white paper and presentation slides for the upcoming DMC meeting. By January 8, 2008, the Steering Committee was informed that the DMC would meet on January 17, 2008 to give its recommendation on the Achieve Trial.

54. Between January 8 and January 18, 2008, Co-Portfolio Manager 1 and Benhamou exchanged numerous emails. The emails were mostly social in nature. Co-Portfolio Manager 1 told Benhamou that he was "desperately trying to find time to get over to Paris before Milan [where the 43rd annual meeting of the European Association for the Study of the Liver ("EASL 2008") Conference would be held in April 2008]," so he could have dinner with Benhamou. He also invited Benhamou to his home where, according to his email, "the wine sits and waits for us in my cellar!" In a January 10 email, Benhamou also asked Co-Portfolio Manager 1 for stock advice, including advice regarding HGSI stock:

> As I am thinking to put money in the stock I would like to have your opinion on:
> 1. Human Genome, do you think the stock will go up? What price? When?
> 2. Do you have any information on KING PHARMA?
> Any other ideas for the near future[?]

In response, the portfolio manager stated, "I think HGSI is a good company and not currently reflecting the value of albuferon ... let alone the rest of their pipeline ... but rest is VERY high risk. The stock will go up on the albuferon data ... this year."

55.     Upon information and belief, Benhamou tipped additional material non-public information about the Achieve Trial to Co-Portfolio Manager 1 on or before January 17, 2008. On the morning of January 17, 2008, less than four hours before the DMC met, Co-Portfolio Manager 1 emailed Benhamou and asked, "Want to touch base today?"

## VII.   **Benhamou Learned Of The Steering Committee's Recommendation**

56.     The DMC meeting took place at 1:30 p.m. EST on Thursday, January 17, 2008, by teleconference, and occurred in three phases: (i) an initial open session meeting in which HGSI, the Steering Committee members, and others participated, (ii) a closed session meeting with DMC members and (iii) a concluding open session.

57.     After more than an hour of closed session deliberations, the DMC recommended that (i) the 1200 microgram arm of the Achieve Trial be stopped and that all patients receiving that dosage level be given the 900 microgram dose instead and (ii) all patients with interstitial findings on their chest x-rays (of which there were eighteen) be removed from treatment.

58.     Benhamou did not participate in the concluding open session, but, later that afternoon, HGSI emailed him and other Steering Committee members details of the DMC's recommendation.

## VII. **The January 2008 Tip and Trades**

59. On January 18, 2008, at 9:41 a.m. EST, HGSI sent the Steering Committee members a second email in which HGSI (i) detailed the DMC recommendation to dose reduce all patients on the 1200 microgram arm to the 900 microgram arm; (ii) requested guidance from the Steering Committee on how to convey the DMC's recommendation in a letter to investigators and in a press release, a draft of which was to be ready later that day or over the weekend; and (iii) requested guidance from Benhamou on how to address concerns that may be raised by European Union and other global investigators participating in the trial. HGSI also requested times in which to call Benhamou to discuss the DMC recommendation.

60. Less than ten minutes after receiving HGSI's email, at 9:49 a.m. EST, Benhamou told HGSI that he was not available and requested a time to call the following day.

61. At 9:50 a.m. EST, exactly one minute after telling HGSI he was not available, Benhamou contacted Co-Portfolio Manager 1 and the two had a conversation in which Benhamou tipped additional material negative non-public information about the Achieve Trial to Co-Portfolio Manager 1. Co-Portfolio Manager 1 knew or should have known that the information tipped by Benhamou was confidential and was disclosed by Benhamou in breach of his fiduciary duty to HGSI.

62. Within minutes of receiving the tip from Benhamou, Co-Portfolio Manager 1 caused each of the Healthcare Funds to sell their remaining holdings of HGSI common stock based on the information Benhamou tipped to him. Specifically, at 9:58 a.m. EST, on January 18, 2008, Co-Portfolio Manager 1 instructed Healthcare Trader 1 via instant message to sell all remaining shares of HGSI common stock held by the Healthcare Funds. Co-Portfolio Manager 1 was acting pursuant to the authority delegated to him by the Healthcare Fund Advisors.

63.     Shortly after receiving Co-Portfolio Manager 1's instructions, Healthcare Trader 1 contacted a certain investment bank ("Investment Bank 2") and asked for a bid to buy all remaining 3.2 million shares of HGSI held by the Healthcare Funds. When Investment Bank 2 came back with a bid of approximately $10 per share, Co-Portfolio Manager 1 and Healthcare Trader 1 declined the offer and decided instead to sell the Healthcare Funds' HGSI shares into the market.

64.     By the close of the markets on January 18, 2008, the Healthcare Funds had sold almost 700,000 shares of HGSI common stock at an average price of $10.72 a share.

| Fund | Shares Sold Jan. 18, 2008 |
|------|---------------------------|
| Hedge Fund 1 | 201,800 |
| Hedge Fund 2 | 199,300 |
| Hedge Fund 3 | 20,800 |
| Hedge Fund 4 | 176,100 |
| Hedge Fund 5 | 84,100 |
| Hedge Fund 6 | 15,800 |
| **Totals** | 697,100 |

VIII.     **Benhamou Continued To Receive Information
About The Timing And Content Of The Press Release
And Investigator Letter Throughout The Long Weekend**

65.     From January 18, 2008 through Monday, January 21, 2008, Benhamou worked closely with executives at HGSI on (i) the content and logistics of the letter to investigators, which was to be issued simultaneously with HGSI's press release announcing the dose reduction and (ii) on HGSI's response to questions that were expected to arise from the public and the Achieve Trial investigators.

66.     Benhamou knew, no later than Friday, January 18, 2008, that HGSI planned to issue its press release during the middle of the following week. He knew, no later than January 21, 2008, that HGSI would issue its press release on Wednesday, January 23, 2008.

67.     Upon information and belief, Benhamou tipped additional material non-public information about the Achieve Trial to Co-Portfolio Manager 1 on or before January 22, 2008. On the morning of Tuesday, January 22, 2008 – the first trading day after the Martin Luther King Holiday weekend and the day before HGSI was to issue its press release – Co-Portfolio Manager 1 emailed Benhamou and asked, "[A]re you around for a quick call today. Love to catch up."

### IX.    The Other January 2008 Tip And Trade Acceleration

68.     Co-Portfolio Manager 1 called Benhamou at 10:44 a.m. EST, on January 22, 2008. During that call, Benhamou tipped Co-Portfolio Manager 1 additional material non-public information about the Achieve Trial. Co-Portfolio Manager 1 knew or should have known that the information was confidential and was disclosed by Benhamou in breach of his duty to HGSI to keep such information confidential. Pursuant to the authority delegated to him by the Healthcare Fund Advisors, and in response to the information that Benhamou tipped him, Co-Portfolio Manager 1 caused the Healthcare Funds to accelerate their sales of HGSI common stock.

69.     While Co-Portfolio Manager 1 was still on the telephone with Benhamou, he and Healthcare Trader 1 engaged in the following communication via instant message, in which he indicated, among other things, that he expected HGSI's stock price to drop and instructed the trader to become more aggressive with the sales:

| | |
|---|---|
| 10:49:59 a.m. EST | *Co-Portfolio Mgr. 1:* "[Healthcare Trader 1], try and get a little more aggressive with hgsi" |
| 10:50:08 a.m. EST | *Healthcare Trader 1:* "ok" |
| 10:50:33 a.m. EST | *Healthcare Trader 1:* "225K out of 980 is pretty aggressive but I hear you" |

| 10:51:12 a.m. EST | *Co-Portfolio Mgr. 1:* "i show we still own 2.3m shares." |
| 10:51:13 a.m. EST | *Co-Portfolio Mgr. 1:* "is that right" |
| 10:51:33 a.m. EST | *Healthcare Trader 1:* "yes, we held over 3MM" |
| 10:51:37 a.m. EST | *Co-Portfolio Mgr. 1:* "ok." |
| 10:51:40 a.m. EST | *Co-Portfolio Mgr. 1:* "work out of all of it" |
| 10:51:48 a.m. EST | *Healthcare Trader 1:* "i AM TRYING" |
| 10:51:51 a.m. EST | *Co-Portfolio Mgr. 1:* "oh" |
| 10:51:54 a.m. EST | *Co-Portfolio Mgr. 1:* "ok" |
| 10:53:01 a.m. EST | *Co-Portfolio Mgr. 1:* "[Healthcare Trader 1] let's look together at the optino market" |
| 10:53:28 a.m. EST | *Healthcare Trader 1:* "optino? Is that Latin for options?" |
| 10:53:28 a.m. EST | *Co-Portfolio Mgr. 1:* "i think this stock could see 7 or 8" |
| 10:54:25 a.m. EST | *Co-Portfolio Mgr. 1:* "we can sell calls?" |
| 10:55:14 a.m. EST | *Healthcare Trader 1:* "We need to find someone willing to amke [sic] a bid on that many calls and that is problematic in this environment" |

Co-Portfolio Manager 4 saw the instant message and suggested shorting HGSI's debt as a hedge.

70.     Approximately half an hour later, at 11:28 a.m. EST, Benhamou informed Co-Portfolio Manager 1 that his daughter would be visiting New York and asked if Co-Portfolio Manager 1 could recommend a car service to pick her up at the airport. Co-Portfolio Manager 1 said he would make the arrangements and pay for the car service, and he told Benhamou, "Don't hesitate to let me know if you need anything."

## X.     The Healthcare Funds Sold All Remaining HGSI Shares In A Block Trade At The End Of The Day On January 22, 2008

71.     Throughout the day on January 22, 2008, the Healthcare Funds continued to sell HGSI shares into the market at an average price of $10.37. Near the end of the trading day, with almost 2 million HGSI shares remaining, Healthcare Trader 1 contacted Investment Bank 2 again and asked for a bid on their remaining shares. Investment Bank 2 came back with a bid of $9.63 per share for the block trade. Co-Portfolio Manager 1 accepted the offer and all remaining shares of HGSI common stock held by the Healthcare Funds were sold shortly prior to the close

of the markets. The funds' sale of HGSI shares on January 22 comprised 47 percent of the total trading volume in HGSI shares that day.

72. The Healthcare Funds, collectively, made little profit on their sales of HGSI common stock between December 7, 2007 and January 22, 2008 and certain of the funds realized losses on the transactions:

| Fund | Realized Profit/Loss on Shares Sold Dec. 7, 2007 – Jan. 22, 2008 |
|---|---|
| Hedge Fund 1 | $(495,108.24) |
| Hedge Fund 2 | $48,010.64 |
| Hedge Fund 3 | $(55,290.53) |
| Hedge Fund 4 | $117,518.63 |
| Hedge Fund 5 | $382,477.97 |
| Hedge Fund 6 | $38,885.87 |
| **Totals** | $36,494.33 |

Nonetheless, in anticipation that HGSI's announcement on January 23 would cause HGSI's stock price to decline, Co-Portfolio Manager 1 and the other co-portfolio managers instant-messaged each other and expressed relief that the funds had completely sold out of their HGSI position:

| | | |
|---|---|---|
| 3:36:12 p.m. EST | *Co-Portfolio Mgr. 1:* | "how did we make out on hgsi?" |
| 3:36:13 p.m. EST | *Co-Portfolio Mgr. 1:* | "net" |
| 3:37:11 p.m. EST | *Healthcare Trader 1:* | "we would have been better off hitting the $10 bid" |
| 3:37:17 p.m. EST | *Co-Portfolio Mgr. 1:* | "by how much?" |
| 3:37:32 p.m. EST | *Co-Portfolio Mgr. 1:* | "and in the context of a market meltdown . . . i'm not concerned about that" |
| 3:37:36 p.m. EST | *Healthcare Trader 1:* | "calculating it now" |
| 3:37:42 p.m. EST | *Healthcare Trader 1:* | "right" |

\* \* \* \* \*

| 4:10:50 p.m. EST | *Healthcare Trader 1:* | "HGSi we are flat" |
| 4:11:03 p.m. EST | *Co-Portfolio Mgr. 2:* | "nice" |
| 4:11:07 p.m. EST | *Co-Portfolio Mgr. 3:* | "awesome" |

XI.  **HGSI Issued Its Negative Press Release**
      **And The Healthcare Funds Bought HGSI Shares**

73.  On January 23, 2008, at 7:00 a.m. EST, HGSI issued its press release concerning the DMC's recommendation and its decision to stop the 1200 microgram arm of the Achieve Trial. As a result of the announcement, HGSI's share price dropped from $10.02 a share at the close of the previous day, to $5.62 a share at the close of January 23, 2008, or 44 percent.

74.  By virtue of having sold all of their holdings (or approximately 6 million shares) of HGSI common stock by the close of the prior day, the Healthcare Funds avoided at least $30 million in losses.

75.  Nonetheless, on the morning of January 23, 2008, Co-Portfolio Manager 1 told his co-portfolio managers that he still wanted to own HGSI stock and he recommended that, if HGSI's share price hit $6, they should buy HGSI shares again. Co-Portfolio Manager 2 opined that, if Albuferon's safety proves to be safe at the lower (900 microgram) dose level, then the investment thesis for owning HGSI has not changed.

76.  On January 23, 2008, acting pursuant to the authority delegated to him by the Healthcare Fund Advisors, Co-Portfolio Manager 1 caused the Healthcare Funds to purchase more than 2.2 million shares of HGSI common stock at an average price of $5.60 per share.

| Fund | Shares Purchased Jan. 23 2009 |
| --- | --- |
| Hedge Fund 1 | 763,541 |
| Hedge Fund 2 | 439,400 |

| Fund | Shares Purchased Jan. 23, 2009 |
|------|-------------------------------|
| Hedge Fund 3 | 79,200 |
| Hedge Fund 4 | 666,900 |
| Hedge Fund 5 | 489,700 |
| Hedge Fund 6 | 0 |
| **Totals** | 2,438,741 |

The funds continued to purchase shares of HGSI common stock in the ensuing days.

77.     The co-portfolio managers maintained their investment thesis that HGSI was undervalued based on Albuferon's commercial opportunities and maintained their target of $17 per share through at least April 2008.

### CLAIMS FOR RELIEF

### CLAIM I
### Violations of Exchange Act Section 10(b) and Rule 10b-5

78.     Paragraphs 1 through 77 are realleged and incorporated by reference.

79.     The information concerning Phase 3 of the Achieve Trial was material and non-public and considered by HGSI to be confidential.   HGSI had policies protecting such confidential information and, in addition, protected such information through its contractual arrangements.

80.     Benhamou learned the material non-public information regarding Phase 3 of the Achieve Trial during the course of his membership on the Achieve Trial Steering Committee and in his capacity as a country lead investigator for France.   Benhamou knew, recklessly disregarded, or should have known, that he directly, indirectly or derivatively owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to keep the information confidential.

81.     Benhamou tipped material non-public information concerning Phase 3 of the Achieve Trial to Co-Portfolio Manager 1, with whom he had a consulting relationship and friendship, with the expectation of receiving a benefit.

82.     In connection with the purchase or sale of securities, Co-Portfolio Manager 1 knew, recklessly disregarded, or should have known, that the material non-public information received from Benhamou was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

83.     Benhamou is liable for the Healthcare Funds' trades – directly or indirectly – because he unlawfully tipped material, non-public information to Co-Portfolio Manager 1, who effected trades on behalf of the funds, controlled the funds and/or unlawfully tipped the information to the funds.

84.     By virtue of the foregoing, Benhamou directly or indirectly, in connection with the purchase or sale of a security, by use of means or instrumentalities of interstate commerce, of the mails, or the facilities of a national securities exchange:

> a.  employed devices, schemes, or artifices to defraud;
>
> b.  made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
> c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

85.     By engaging in the foregoing conduct, Benhamou, directly or indirectly violated, and unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## CLAIM II
### Violations of Securities Act Section 17(a)

86. Paragraphs 1 through 85 are realleged and incorporated by reference.

87. By virtue of the foregoing, Benhamou, acting knowingly, recklessly, or negligently in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

      a. employed devices, schemes, or artifices to defraud;

      b. obtained money or property by means of untrue statements of a material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c. engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser.

88. By engaging in the foregoing conduct, Benhamou directly or indirectly violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

(a) permanently restraining and enjoining Defendant, his agents, servants, employees, and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, pursuant to Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d)(1) [15 U.S.C. § 78u(d)(1)], from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5];

(b)      ordering Defendant to disgorge, with prejudgment interest, all illicit trading profits and/or losses avoided and all other ill-gotten gains received as a result of the conduct alleged in this Complaint;

(c)      ordering Defendant to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21A and/or 21(d)(3) [15 U.S.C. §§ 78u(d)(3), 78u-1]; and

(d)      grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable.

Dated: October 30, 2010
         Washington, DC

Respectfully submitted,

Suzanne J. Romajas (SR-4531)
Assistant Chief Litigation Counsel
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549-4030
Tel: 202-551-4473 (Romajas)
Email: RomajasS@sec.gov

Counsel for Plaintiff

Of Counsel:
Cheryl J. Scarboro
Charles J. Felker
Deborah A. Tarasevich
Matthew L. Skidmore