UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALBERT BRODZINSKY and              :
EVELYN BRODZINSKY,                 :        3:11cv10 (WWE)
            Plaintiff,             :
                                   :
v.                                 :
                                   :
FRONTPOINT PARTNER LLC,            :
YVES BENHAMOU, JOSEPH F.           :
"CHIP"SKOWRON III, FRONTPOINT      :
HEALTHCARE FLAGSHIP FUND, L.P.     :
f/k/a FRONTPOINT HEALTHCARE        :
FUND, L.P., FRONTPOINT             :
HEALTHCARE HORIZONS FUND,          :
L.P., FRONTPOINT HEALTHCARE        :
I FUND, L.P., FRONTPOINT           :
HEALTHCARE FLAGSHIP                :
ENHANCED FUND, L.P. f/k/a          :
FRONTPOINT HEALTHCARE              :
FUND 2X, L.P., FRONTPOINT          :
HEALTHCARE LONG HORIZONS           :
FUND, L.P., FRONTPOINT             :
HEALTHCARE CENTENNIAL FUND,        :
L.P., FRONTPOINT HEALTHCARE        :
FLAGSHIP FUND GP, LLC, f/k/a       :
FRONTPOINT HEALTHCARE FUND         :
GP, LLC, FRONTPOINT                :
HEALTHCARE HORIZONS FUND           :
GP, LLC, FRONTPOINT UNIVERSAL      :
GP, LLC, FRONTPOINT                :
HEALTHCARE FLAGSHIP ENHANCED:
FUND GP, LLC f/k/a FRONTPOINT      :
HEALTHCARE FUND 2X GP, LLC,        :
FRONTPOINT HEALTHCARE LONG         :
HORIZONS FUND GP, LLC,             :
FRONTPOINT HEALTHCARE              :
CENTENNIAL FUND GP, LLC,           :
            Defendants.            :

<u>MEMORANDUM OF DECISION ON MOTIONS TO DISMISS</u>

In this putative class action, plaintiffs Albert and Evelyn Brodzinski allege that they

were damaged as shareholders of Human Genome Sciences, Inc. ("HGSI") due to the

sale of such stock by defendants Joseph "Chip" Skowron, Yves Benhamou, FrontPoint

Partners LLC ("Frontpoint") and the six healthcare related hedge funds affiliated with

defendant FrontPoint Partners ("Hedge Fund Defendants")[1] and six investment advisors

("Investment Advisor Defendants")[2] while in possession of undisclosed, material,

negative, and non-public information.  Specifically, plaintiffs allege violation of Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), against all defendants

(count I); violation of Section 20A of the Securities Exchange Act, 15 U.S.C. § 78t-1,

against all defendants (count II); and violation of Section 20(a) of the Securities

Exchange Act, 15 U.S.C. § 78t(a), against FrontPoint, the Investment Advisor

Defendants and Skowron (count III).

     Defendants have moved to dismiss the action.

## BACKGROUND

     Plaintiffs are individuals who purchased 1,000 shares of HGSI on January 3,

2008.

     Defendant Skowron is a medical doctor and a former portfolio manager of the six

Hedge Fund Defendants affiliated with and managed by defendant FrontPoint Partners.

---

[1]FrontPoint Healthcare Flagship Fund, L.P. f/k/a, FrontPoint Healthcare Fund, L.P., FrontPoint Healthcare Horizons Fund, L.P., FrontPoint Healthcare I Fund, L.P., FrontPoint Healthcare Flagship Enhanced Fund, L.P. f/k/a FrontPoint Healthcare Fund 2X, L.P., FrontPoint Healthcare Long Horizons Fund, L.P., and FrontPoint Healthcare Centennial Fund, L.P.

[2]FrontPoint Healthcare Flagship Fund GP, LLC f/k/a FrontPoint Healthcare Fund GP, LLC, FrontPoint Healthcare Horizons Fund GP, LLC, FrontPoint Universal GP, LLC, FrontPoint Healthcare Flagship Enhanced Fund GP, LLC f/k/a FrontPoint Healthcare Fund 2X GP, LLC, FrontPoint Healthcare Long Horizons Fund GP, LLC, and FrontPoint Healthcare Centennial Fund GP, LLC.

Defendant Ives Benhamou, is a medical doctor with an expertise in the treatment of hepatitis C, who was one of five members of a Steering Committee overseeing the trials for the drug Albumin Interferon Alfa 2-1 ("Albuferon").  Benhamou worked for an expert networking firm, Guidepoint Global, LLC, and he consulted with Skowron, the Investment Advisor Defendants and the Hedge Fund Defendants in March 2006.  In April 2007, Skowron and Benhamou circumvented Guidepoint Global by dealing with each other directly.

From February 1 through December 3, 2007, the Hedge Fund Defendants purchased approximately 6.2 million shares of HGSI at an average price of $10.32 per share.

Between November 2007 and January 23, 2008, Benhamou learned information about Phase 3 of the Albuferon trial that had negative implications for the drug's future commercial potential.  Benhamou communicated this information to Skowron and thus to the Investment Advisor Defendants and the Hedge Fund Defendants.

Specifically, plaintiffs allege that, on December 7 and 10, Benhamou tipped material non-public information to Skowron, who then caused the Hedge Fund Defendants to sell over 2.8 million or 46 percent of their HGSI common stock.

Between January 8 and 18, 2008, Skowron and Benhamou exchanged numerous emails, and during one of these exchanges, Benhamou tipped material non-public information about the drug trials and the January 17, 2008 meeting of the Data Monitoring Committee ("DMC"), an independent committee responsible for overseeing the safety of patients involved.  On January 17, 2008, Skowron emailed Benhamou to ask whether he wanted "to touch base today?"  That day, the DMC met and

recommended that the dosage of patients be reduced and that certain patients be removed from treatment due to adverse effects.

On January 18, HGSI sent an email to the Steering Committee members requesting, inter alia, guidance on how to convey the DMC's recommendation in a letter to investigators and in a press release.  Ten minutes after receiving HGSI's email, Benhamou told HGSI that he was not available and requested a time to call the following day.  One minute later, Benhamou contacted Skowron and disclosed that HGSI was reducing the dosage to patients in the clinical trial as result of adverse events.  Within minutes of receiving that tip, Skowron caused the Hedge Fund Defendants to sell 697,100 shares of HGSI by the close of the market that day.

From January 18 through 21, Benhamou worked with executives at HGSI on the letter to investigators of the drug trial, which letter was to be issued simultaneously with HGSI's press release announcing the dose reduction, and HGSI's response to questions expected to arise from the public and investigators.  By no later than January 21, Benhamou knew that HGSI would issue its press release on January 23.

On the morning of January 22, Skowron called Benhamou, who communicated the information about HGSI's plan to issue its press release the next day. Skowron then caused the accelerated sale of the Hedge Fund Defendants' remaining holdings of HGSI common stock.

On January 23, 2008, HGSI announced publicly that all patients who had been administered a higher dosage level of Albuferon in its clinical trial would be moved to a lower dosage level due to a safety issue detected during Phase 3 of the trial.  In response to this announcement, the market price of HGSI's common stock fell by

approximately 44 percent by the close of the market.

On January 23, as the price of HGSI stock declined, the Hedge Fund Defendants went back into the market and repurchased 1.5 million more shares of HGSI common stock at reduced prices.  These shares were then sold at a profit between January 24 and 31, 2008.

On February 13, the SEC advised FrontPoint that it was investigating the January sale of HGSI stock.  FrontPoint's counsel and the SEC scheduled an interview with Skowron for February 26.

On February 20, Skowron informed Benhamou about the SEC investigation and that FrontPoint's counsel wished to interview Benhamou by phone.  Skowron also urged Behnamou to deceive FrontPoint's counsel about his disclosures of confidential information.  During his interview with FrontPoint's counsel, Benhamou indicated that he had not provided Skowron with any non-public information about the Albuferon trial.

On February 24, Skowron traveled to Boston to meet Benhamou.  At that time, he attempted to give Benhamou a bag containing two stacks of United States currency. Benhamou did not accept the money.

In April 2008, Skowron met Benhamou in Milan, Italy.  At that time, he gave Benhamou $10,000, which he indicated was in appreciation of Behnhamou's contributions, consultations and time.  Skowron reiterated that Benhamou should continue to state that he had not provided non-public information to Skowron.

In a May 14, 2009 administrative proceeding of the French securities regulator, Benhamou testified that he did not reveal non-public information to Skowron.

On August 11, 2009, Skowron provided sworn testimony to the SEC indicating

that he had not received non-public information about the Albuferon trial and had not given Benhamou any gifts or anything of value.

In November 2010, the SEC filed a civil action against Benhamou and the United States Attorney's Office filed a criminal action against him.  Both actions alleged violation of the federal securities law.  On April 11, 2011, Benhamou pleaded guilty to the counts of conspiracy to commit securities fraud, securities fraud, conspiracy to obstruct justice, and making false statements.

On April 12, 2011, the SEC filed an amended complaint in the civil action against Benhamou that added Skowron as a defendant.  That same day, the United States Attorney's Office filed a criminal action against Skowron, alleging that he had conspired to commit and had committed securities fraud and conspired to obstruct justice. Skowron has pleaded guilty to these charges alleging participation in the insider trading scheme.

## DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure12(b)(1) "challenges the court's statutory or constitutional power to adjudicate the case before it."  2A James W. Moore et. al., Moore's Federal Practice, ¶ 12.07, at 12-49 (2d ed. 1994).  Once the question of jurisdiction is raised, the burden of establishing subject matter jurisdiction rests on the party asserting such jurisdiction.  See  Thomson v. Gaskill, 315 U.S. 442, 446 (1942).

The function of a motion to dismiss under FRCP 12(b)(6) is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.,

748 F. 2d 774, 779 (2d Cir. 1984).  When deciding a motion to dismiss for failure to state

a claim, the Court must accept all well-pleaded allegations as true and draw all

reasonable inferences in favor of the pleader.  <u>Hishon v. King & Spalding</u>, 467 U.S. 69,

73 (1984).  The complaint must contain the grounds upon which the claim rests through

factual allegations sufficient "to raise a right to relief above the speculative level."  <u>Bell</u>

<u>Atl. Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965 (2007).

In addition, securities fraud claims are subject to the heightened pleading

standards set forth in Rule 9(b), which requires a plaintiff to "state with particularity the

circumstances constituting fraud ...." Fed. R. Civ. P. 9(b).  In order to satisfy Rule 9(b), a

securities fraud complaint premised upon material misstatements "must (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state

where and when the statements were made, and (4) explain why the statements were

fraudulent."  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007).

<u>Standing</u>

Defendants assert that plaintiffs lack standing to bring claims under Section 20A

and Section 10(b) of the Securities Exchange Act.

Section 20A provides:

 Any person who violates any provision of [the Exchange Act] or the rules or
regulations thereunder by purchasing or selling a security while in possession of
material, nonpublic information shall be liable ... to any person who,
contemporaneously with the purchase or sale of securities that is the subject of
such violation, has purchased ... securities of the same class.

Similarly, a plaintiff needs to have purchased shares contemporaneously with an alleged

insider sale to assert an insider trading claim under Section 10(b).  <u>Wilson v. Comtech</u>

Telecommunications Corp., 648 F.2d 88, 94 (1981); Brody v. Transitional Hosp. Corp., 280 F.3d 997, 1001 (9th Cir. 2002).

Thus, to withstand the motion to dismiss the first and second counts, plaintiffs must plead that the defendants traded contemporaneously with the plaintiffs.  In re Take-Two Interactive Securities Litig., 551 F. Supp. 2d 247 (S.D.N.Y. 2008).  Here, defendants attack plaintiffs' ability to satisfy the contemporaneous requirement.

Contemporaneous is not statutorily defined.  District courts have found contemporaneous trades occurred that were on the same day, less than a week apart, or within the entire period while relevant and nonpublic information remained undisclosed.  See In re Enron Corp. Securities, Derivative & ERISA Litig., 258 F. Supp. 2d 576, 600 (S.D. Tex. 2003).  The legislative history to the statutes indicate that a trade within seven days should be considered contemporaneous.  See In re Petco Animal Supplies Inc. Sec. Litig., 2005 WL 5957816, *37 (S.D. Cal. 2005) (discussing cases cited in the legislative history).

Within the Second Circuit, courts have considered as contemporaneous trades that occurred within a reasonable period of time, usually within a few days of each other.  In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 508 (S.D.N.Y. 2011).  The Second Circuit has explained:

> To extend the period of liability well beyond the time of the insider's trading simply because disclosure was never made could make the insider liable to all the world. Any duty of disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the "disclose or abstain" rule because they do not suffer the disadvantage of trading with someone who has superior access to information.

Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 94 (1981).  A more restrictive interpretation of contemporaneousness serves as a proxy for the traditional requirement of contractual privity between plaintiffs and defendants, and thus it protects only those who might have traded with and been harmed by insiders.  Johnson v. Aljian, 257 F.R.D. 587, 595 (C.D. Cal. 2009).

In this instance, plaintiffs' purchase took place on January 3, 2008, and the alleged insider trades occurred during the period between December 7-18, 2007, and on January 18 and 22, 2008.  Thus, the duration between plaintiffs' and defendants' trades is approximately two weeks.

Plaintiffs respond that the Court should adopt a rule that a reasonable period encompasses the entire period that relevant material non-public information remains undisclosed.  Plaintiffs advance that their trades occurred after defendants' sales and during a six-week period of deceit and illegality.

Adoption of plaintiffs' broad theory of contemporaneous could compromise the fundamental principle that plaintiffs must have been harmed by defendants' conduct. See Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 472 (1982) (litigant must have suffered actual or threatened injury as a result of the illegal conduct of the defendant, the injury must be fairly traceable to the challenged action, and the injury must be redressable by a favorable decision). Similarly, Wilson articulated the concern that Section 20A liability be limited to only the time period in which the non-insider was plausibly disadvantaged by the insider trading. Courts have reasoned that purchases within six days of insider sales are contemporaneous because stock trades settle within three days and a three day

weekend could separate the potential for a subsequent trade.  See Johnson, 257 F.R.D. at 595.  After an insider's sale settles, other traders are no longer in the market with that insider and are not harmed by the failure to disclose.  See In re Silicon Graphics, Inc. Securities Litig., 970 F. Supp. 746, 761 (N.D. Cal. 1997).  Consistent with this view, district court decisions within the Second Circuit have tended to find that five or even seven days between the trades is a reasonable period.  See  Take-Two, 551 F. Supp. 2d at 311 (five days); S.E.C. v. McCaskey, 2002 WL 850001, *11 (S.D.N.Y. 2002) (a week was contemporaneous).

Accordingly, plaintiffs' trades occurred beyond the period considered to be the market relevant to the alleged insider trading, and the first and second counts will therefore be dismissed as lacking standing.

Count III

Defendants argue that Count III alleging Control Person liability pursuant to Section 20(a) of the Securities Exchange Act fails to plead adequately the prima facie case.

Section 20(a) provides:

Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a prima facie case of control person liability in the Second Circuit, a plaintiff must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some

10

meaningful sense, a culpable participant in the controlled person's fraud." ATSI
Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  District
Courts have held that "culpable participation" is a pleading requirement subject to the
heightened standard of Federal Rule of Civil Procedure 9.  CLAL Finance Batucha Inv.
Management, Ltd. v. Perrigo Co., 2010 WL 417710, *9 (S.D.N.Y. 2010).  Thus, to
withstand a motion to dismiss, a Section 20(a) claim must allege particularized facts of
the controlling person's conscious misbehavior or recklessness.

In reviewing the allegations of the complaint, the Court notes that Count III
alleges:

> By virtue of their positions as controlling persons of the Hedge Fund
> Defendants and their conduct in causing the Hedge Fund Defendants to
> sell their shares of HGSI during the Class Period while in possession of
> material adverse information about HGSI, the Control Person Defendants
> are jointly and severally liable, pursuant to Section 20(a) of the Exchange
> Act, to the plaintiffs and the Class with the Hedge Fund Defendants for the
> Hedge Fund Defendants' liability under Count I and II above.

Thus, the Section 20(a) claims are alleged to be premised upon liability for those
counts that this Court has found dismissal appropriate.  Accordingly, Count III should
also be dismissed.

**CONCLUSION**

For the foregoing reasons, the motions to dismiss [docs. #119, 120 and 127] are
GRANTED.  The clerk is instructed to close this case.

_____/s/_____
Warren W. Eginton
Senior United States District Judge

Dated this _25th__ day of April 2012 at Bridgeport, Connecticut.